EX PARTE FINN. .

STATE *ex rel.* V. FINN.

[52 Pac. 756.]

</div>

SUSPENSION OF ATTORNEY FOR WILLFUL MISCONDUCT.*— An attorney is guilty of "willful misconduct" in his profession in affixing his official jurat as notary public to purported affidavits which were not in fact sworn to before him, and causing them to be filed for use in an action in which he was attorney for one of the parties.

IDEM.— In such a case it is immaterial that the statements contained in the affidavits were true, nor is his action excused by the fact that the affidavits were not of use because the case was decided on other grounds; such conduct was a reckless and willful disregard of professional ethics.

IDEM.— An attorney cannot palliate willful misconduct in his profession on the ground that such conduct was customary in the community where he resided.

REASONS FOR SUSPENSION OF ATTORNEYS.— Proceedings for the disbarment of attorneys for misconduct are not for the purpose of punishment, but are entertained for the protection of the court, the proper administration of justice, the dignity and purity of the profession, the public good and the protection of clients.

Proceeding by the state, on the relation of the State Bar Association, for the disbarment of C. H. Finn, an attorney at law.

<div align="right">SENTENCE OF SUSPENSION.</div>

*NOTE.—Section 1047, Hill's Ann. Laws, provides that "An attorney may be removed or suspended by the supreme court. * * * (3) For being guilty of any willful deceit or misconduct in his profession."— REPORTER.

For the petition there was an oral argument by *Mr. Cicero M. Idleman*, attorney-general.

*Contra*, there was an oral argument by *Messrs. Thos. H. Crawford* and *Geo. G. Bingham*.

Per Curiam. This is a proceeding instituted by the grievance committee of the State Bar Association to disbar the defendant from further practicing as an attorney before the courts of this state, for willful misconduct in his profession. After the issues were made up, the cause was referred to Hon. Robert Eakin, who took and reported the testimony, together with his findings of fact and conclusions of law. The nature of the charges preferred sufficiently appears from the findings of fact, which are full, clear and accurate deductions from the testimony submitted. Said findings, including a necessary modification of the seventh, are as follows: "(1) That on or about the tenth day of October, 1896, there was pending in the said supreme court, on appeal, a suit in which Homer Nessley and others were plaintiffs and appellants, and Freeman S. Ladd was respondent, and that the said C. H. Finn was one of the attorneys of record for the said Freeman S. Ladd; that after the affirmance of the decree therein the said suit was pending upon a motion by the appellants to have the said cause reopened and referred back to the trial court to take further testimony on behalf of the said appellants, which motion was supported by the affidavits of E. S. McComas and R. W. Deal; and that on said tenth day of October, 1896, for the purpose of impeaching the said affidavits, and the character of the said E. S. McComas

and R. W. Deal for truth and veracity, said C. H. Finn furnished to his client, the said Freeman S. Ladd, a form for several affidavits, substantially to the effect that the subscribers, after being first duly sworn, each for himself, and not one for the other, solemnly swore that he was acquainted with the general reputation of E. S. McComas and R. W. Deal for truth and veracity in the community in which they lived, and that such reputation was bad.    (2) That said Freeman S. Ladd secured the following named persons to sign the said affidavits, viz: F. Ousley, W. Berkely, A. Ferguson, C. McClure, Peter Kuhn, E. O. Crandall, G. W. Bartmess, F. M. Bartmess and William Martin. (3) That none of the said parties who signed the said pretended affidavits signed the same in the presence of C. H. Finn, nor ever went before him to swear to said affidavits, and none of them were sworn to said affidavits by said C. H. Finn, but that the said C. H· Finn on the tenth day of October, 1896, affixed his official jurat to the said affidavits in the following words and figures, viz: 'Subscribed and sworn to before me this tenth day of October, 1896.   C. H. Finn, notary public for Oregon,'— and in attestation thereof affixed thereto his notarial seal as notary public for the State of Oregon.   (4) That thereafter the said C. H. Finn, as one of the attorneys for the said Freeman S. Ladd in said suit, caused said pretended affidavits to be filed in the Supreme Court of the State of Oregon in the said suit.   (5) That the said E. O. Crandall, whose name appears on two of said affidavits, signed the said two affidavits at the request of Freeman S. Ladd at the office of said C. H. Finn, but in the ab-

sence of said Finn; that he read the said affidavits be-
fore signing them, but did not know when they were
so signed where they were to be used; that about an
hour thereafter C. H. Finn saw the said Crandall, and
asked him if he had seen Freeman S. Ladd, and he
replied that he had, and had signed the papers; but
that the said Crandall did not swear to the said affi-
davits, or either of them.    (6) That said Charles Mc-
Clure signed one of said affidavits, relating to the im-
peachment of the character of R. W. Deal for truth
and veracity, on the said tenth day of October, 1896,
on a street of La Grande, at the request of said Ladd;
that he told said Ladd that he would not make oath to
it; that he did not swear to it, and that he did not see
C. H. Finn in relation thereto either before or after
he signed the same.    (7) That said F. M. Bartmess
signed one of said affidavits, relating to the impeach-
ment of the character of the said R. W. Deal for truth
and veracity, on a street of La Grande, at the request
of Freeman S. Ladd, on about October 10, 1896; that
he heard it read before he signed it; that he did not
swear to it before the said C. H. Finn, but that Finn
asked him within a few days whether he had signed
it.    (8) That said Peter Kuhn signed one of said affi-
davits, relating to the impeachment of the character
of said R. W. Deal for truth and veracity; that he did
not know when he signed the same that it was to be
used in the supreme court; that C. H. Finn was not
present when he signed the same, and he did not
swear to it; that he did not see C. H. Finn in relation
to the same at any time; that he would have sworn to
it if he had been called on for that purpose, but that

he did not know that it was to be an affidavit, or sworn to. (9) That said William Martin signed both of said affidavits, relating to the impeachment of the character of R. W. Deal and of E. S. McComas for truth and veracity, on about the tenth day of October, 1896, at the request of Henry Dray, and delivered them to Freeman S. Ladd; that he did not swear to them, nor at any time talk with Mr. Finn in relation thereto until two months after the signing thereof; that he would have sworn to them if he had been asked to. (10) That said W. S. Berkely signed the said affidavit relating to the impeachment of the character of R. W. Deal for truth and veracity, at the request of Freeman S. Ladd; that he did not know it related to the Hilts case in the supreme court; that he did not swear to it, and Mr. Finn was not present, and that he did not see Mr. Finn in relation thereto at any time. (11) That the other signers of the said affidavits were not brought before the referee. (12) That each of said signers of said affidavits, viz., Crandall, McClure, Bartmess, Kuhn and Berkely, understood what was contained in the statement he signed, and believed it to be true. (13) That the said C. H. Finn, in preparing said affidavits and sending them to the supreme court as he did, did not intend to get a false statement of fact before the supreme court; nor did he intend by false testimony to induce the court to discredit the statements of Deal and McComas. (14) But that he did know that said pretended affidavits were not affidavits, but intended that the court should receive and act on them as such."

The defendant testifies: That he saw Crandall, and

asked him whether he had signed the affidavit, to which he answered that he had, and that he assented to it. That he also saw Martin and F. M. Bartmess, and perhaps G. W. Bartmess, and asked them about their signatures — whether they had signed — and that it was his recollection he said to some of them: "You swear to this, do you?" to which they gave their assent (he does not remember to have seen Kuhn, McClure or Berkely at all); that after appending his *jurat* to the affidavits he took them from La Grande over to Union, and laid them upon Mr. Crawford's desk (his co-counsel in the case of *Nessley* v. *Ladd*), not intending that they should be used until he had seen all the affiants, so that no advantage could be taken of him, and that they were sent off without his knowledge; that, when he became aware of what had been done with them, he undertook to call the attention of the supreme court to the matter by letter directed to the chief justice, for the purpose of preventing any action being taken upon the strength thereof.

The findings of fact are scarcely controverted, but it is contended: First, that the statements contained in the affidavits were all true, as a matter of fact; and, second, that they were wholly immaterial and irrelevant, and could not be considered upon the question of a rehearing then pending before this court, and, consequently, that the court could not have been misled thereby. Both these propositions may be conceded, as the motion in the *Nessley-Ladd* case, 30 Or. 564 (48 Pac. 420), was disposed of upon a question of law. There was a question of fact presented, however, and the affidavits were intended to countervail,

in part, at least, the appellant's showing of newly-discovered evidence upon which the motion was based, and a real contention existed, to which the supposed affidavits were pertinent. There was also an ultimate purpose to be subserved in filing them, and it cannot avail the defendant that the matters of fact sought to be controverted thereby proved to be immaterial to an adjudication upon such motion: *In re Houghton*, 67 Cal. 511, 516 (8 Pac. 52).

That the pretended affidavits filed for the consideration of the court were not such in fact will hardly admit of argument. "An affidavit is a written declaration under oath, made without notice to the adverse party": Hill's Ann. Laws, § 803. And the oath is administered by addressing to the affiant a prescribed formula, which may be varied to suit the occasion, whereby he is called upon to attest with uplifted hand the truth of what he is about to assert, under an immediate sense of his responsibility to God: Hill's Ann. Laws, §§ 867, 868. To make such a document legal and authoritative in a court of justice, it takes both the affiant and officer authorized to administer the oath, acting together; and the oath must be either administered by the officer to the affiant, or asseveration must be made to the truth of the matters contained in the affidavit, by the party making it, to the officer, with his sanction: *Matthews* v. *Reid*, 94 Ga. 461 (19 S. E. 247); *Carlisle* v. *Gunn*, 68 Miss. 243 (8 South. 743). Without a direct administration of the oath, there can be no affidavit, under the statute. And, while a nonobservance of the exact formula in its administration may not relieve the affiant of legal responsibility un-

der it (*Dunlap* v. *Clay*, 65 Miss. 454, 4 South. 118), yet it is plain that there must be some actual and *bona fide* attempt at a due observance of the law's requirements, to give validity to the document as an affidavit. In the present case there is no pretense that any such attempt was made as to several of the parties signing the purported affidavits. The defendant says that it was his remembrance that he said to some of them (he could not recall to whom), "You swear to this, do you?" and was answered in the affirmative. But in this he is flatly contradicted by the parties themselves, and it is probable that he made no attempt in either case at the administration of an oath. Crandall, and perhaps one or two others, who were asked if they had signed these papers, indicated that they had, and this is the nearest any of them came to making oath to their contents; but, notwithstanding, the defendant appended his jurat thereto, and signed and sealed the same as a notary public, so that upon their face the documents have the appearance of genuine affidavits, when in fact they are not.

With full knowledge of their true condition, the defendant caused them to be filed for the purpose of influencing the court in favor of his client upon the pending motion. Does what is related constitute willful misconduct on the part of the accused in his profession? If it does, he is amenable to the court under the charges preferred against him; otherwise not. The documents are not false in substance, but they are not genuine in so far as they purport to be the sworn statements of the individuals subscribing them. If they had been filed in the form of mere

statements or representations, there could have been
no possible culpability ascribed to the defendant, but
in that condition they would not have been effective
for any purpose; and this the counsel knew as well as
anyone, for he is by no means ignorant of the prac-
tice.   The very obvious purpose, however, in present-
ing the statements in the form of affidavits and under
the apparent sanction of an oath was to give them the
weight of testimony taken *ex parte,* and entitle them to
the consideration of the court.   The condition is sim-
ilar to that of an officer certifying that he had taken
the deposition of a party, and that, before proceeding
to take the same, the witness had been by him duly
sworn, when in truth and in fact the officer had not
seen the witness, nor at any time attempted to admin-
ister an oath to him touching the statements made;
the only distinction being that the deposition is a
higher grade of testimony, in that an opportunity is
given for cross-examination.   To present such a depo-
sition would be a representation to the court that it
was the genuine testimony of the witness, regularly
taken under the sanction of an oath, when in truth
and in fact it was not at all entitled to consideration
as testimony in the case, and could not, under the
rules of practice, affect in any manner the matters in
dispute.   Such is the effect of the presentation of the
pretended affidavits as genuine, while lacking the
sanction of an oath.   There is a twofold falsity in the
proceeding.   It comprises a false certificate of the ad-
ministration of an oath, and a false representation
that the statements produced are the sworn testimony
of witnesses or supposed affiants, entitling them to the

consideration of the court. That an attorney is culpable who seeks thus to maintain his cause, there can be no contention. Such practice is not consistent with truth, nor does it conform to right principles of fair dealing, and is well calculated to impose upon, overreach and mislead the court into a perversion of justice. Conduct in an officer which may lead to such an end cannot receive the sanction of the court as correct.

The defendant seeks to excuse or palliate his conduct, as it respects his certification of the alleged affidavits, by asserting that the manner in which he obtained the assent of the affiants thereto was the usual manner of administering oaths in such cases. If this is true, there is a signal vice in the practice; and as was said by FINCH, J., in *Re Eldridge*, 82 N. Y. 161 (37 Am. Rep. 558), "it would only make our duty all the more imperative" that the vice may be eradicated. It is due to the profession, however, to say that no such practice has been established. But in any event it could afford but slight excuse for its adoption by an attorney of long practice in the courts of justice. Again, he says that he did not intend that the affidavits should be filed until he had seen all the parties, and that as soon as he ascertained that they had been sent away he undertook to call the attention of the court to the matter, and to withdraw them from its consideration, so far as he was able. Facts contained in the record are not in apparent harmony with these statements in detail. The affidavits themselves bear date October 10, 1896, and were filed in this court the fourteenth of the same month. Other affidavits

of several of the alleged affiants, stating the manner
in which their signatures .were obtained, were taken
on the sixteenth, seventeenth and eighteeth of Novem-
ber, and filed here on the twenty-eighth of the same
month,—the same day upon which defendant's letter
to the chief justice bears date.  It is hardly probable
that, with a *bona fide* intention of seeing the other
parties, he completely lost sight of the affidavits for
the space of more than six weeks, and that in the
meantime he was ignorant of the fact that they were
filed in court.  But he writes:  "I am now informed
that many of the affiants have retracted, for the pur-
pose of screening themselves, by swearing that they
did not make oath to their former affidavits.  Upon
ascertaining this fact, I made due inquiry of them, to
ascertain their object, and learn that they were in-
timidated by the appellants,—induced to believe that
unless the affidavits were subscribed in the presence
of the notary, and oath administered with uplifted
hand, precisely in the manner of swearing a witness
in open court, it did not constitute an oath, and their
declaration   in   the   affidavits,  of  'being  first  duly
sworn,' constitutes perjury, for which they have been
threatened with criminal prosecution."  Here is in-
herent proof that the motive which induced the send-
ing of the letter was not altogether the one ascribed.
And it is not at all probable that the letter would have
ever been indited, had it not been that the manner in
which the affidavits had been obtained was about to
be disclosed to the court, or, taking a more charitable
view, it was doubtless this fact that aroused his sensi-.
bilities of the real condition of the transaction, and of

his own connection therewith. It is evident that he had no intention of asking a withdrawal of these papers, except as a means of extricating himself from the charges of professional misconduct which followed. In this connection it may be remarked that there is not a scintilla of pertinent evidence in the record that any of such witnesses had been intimidated, or threatened with criminal prosecution, although direct inquiry was made of those sworn touching the matter.

His course has not been altogether consistent and candid in other respects. His letter represents that he had, prior to the time the affidavits were forwarded, approached the affiants with the inquiry as to whether the documents contained their signatures, and if they swore to them, "except probably one or two instances," and each answered that he did. In his testimony he is not positive whether he asked any of them if they swore to their respective affidavits, and is not certain of having seen more than three of the purported affiants, but thinks he saw four, and does not pretend that he had seen any others; but the testimony against him contains strong proof that he did not even so much as see more than two of them. He further writes that: "Rather than the respondent's case should be prejudiced in any manner, I prefer to withdraw the affidavits, or that they be not considered on the rehearing." The more direct way, and the one suggested by candor, would have been to have filed a motion in the case, with the clerk, for leave to withdraw the objectionable papers from the files, or that they be stricken therefrom, knowing that they were

not what they purported to be.   The chief culpability
about the transaction, confining the proof to the
charges preferred, is that it shows a reckless and will-
ful disregard of the regularity of the means employed
for the accomplishment of ultimate purposes.  Further-
more, it shows a deliberate willingness to permit the
court to be deceived and misled by the consideration
of fictitious documents and evidence, for the produc-
tion of which the accused is solely and directly re-
sponsible.   Such reckless demeanor by an attorney
is not consistent with professional ethics or obliga-
tions, and constitutes, as we are led to conclude,
willful misconduct in his profession.   This seeming
disregard for truth, we regret to say, has characterized.
the defendant's subsequent demeanor as it respects the
matters charged against him.

   We have examined this case in detail, with great
care and consideration, that no injustice may be done
the defendant; and, while the duty of passing judg-
ment is a delicate and unpleasant one, our duty to an
honorable profession, and the need of preserving un-
sullied that high standard of truth and purity by
which alone an officer of justice should be measured,
demand firmness in declaring the result.   It is not
the purpose of proceedings of this character to punish
the accused attorney, as in matters of criminal cogniz-
ance, but they are inaugurated and entertained as
"necessary for the protection of the court, the proper
administration of justice, and the dignity and purity
of the profession, and for the public good and the
protection of clients": Weeks on Attorneys at Law,
§ 80.   We have determined that a suspension will

accomplish the purpose of correcting the evil in the present case, and therefore direct that the defendant be suspended from practice in all the courts of the state for the period of one year. An order will be entered accordingly.

SENTENCE OF SUSPENSION.