Submitted on the record and briefs September 6, 1984, accused reprimanded
June 17, 1986

In re Complaint as to the Conduct of
# WALTER S. BRISTOW III,
*Accused.*
## (OSB 82-52; SC S30293)

721 P2d 437

David M. Logan, Springfield, submitted a brief for the accused.

Charles G. Duncan, Eugene, submitted a brief as counsel for the Oregon State Bar.

PER CURIAM

## PER CURIAM

This is a lawyer disciplinary proceeding which was instituted by the Oregon State Bar in January 1982, against Walter S. Bristow III. The accused was charged with two violations of the Code of Professional Responsibility alleging a conflict of interest and the failure to preserve the confidences of a client.

The complaint arose out of the accused's relationship with Unlimited Business Exchange (UBE), a barter-trade business. A Mr. Barnes and a Mr. Thomason operated a UBE franchise in Eugene, Oregon. The franchise had been granted to them in April 1979, by Willis L. Wright & Associates, Inc., a Utah corporation. Mr. Wright was the president of the corporation.[1] In 1980, Barnes and Thomason retained the accused as counsel for their franchise.

In 1981, Barnes and Thomason began having doubts about the stability of their relationship with Wright, and they discussed these concerns with the accused. Evidently, other franchisees had similar doubts, because in June 1981, Wright held a meeting in Salt Lake City with all his franchisees in an attempt to address their concerns. At this meeting Wright indicated that he would take steps to resolve the problems.

Approximately one month after the Salt Lake City meeting, Barnes and Thomason found themselves in a position where they needed to depend upon Wright for protection of their commercial interests. The problem involved a Mr. Welling. Welling was a former UBE franchise operator who had quit his franchise, moved his business to Eugene, and was operating in direct conflict with Barnes and Thomason. Barnes and Thomason believed that this action by Welling was in violation of the no-competition provision of the UBE franchise contract. This provision stated that a franchisee would not compete within 20 miles of another UBE franchise during the life of the former franchise and for five years after its termination.

As a result of their concern about Welling, Barnes

---

[1] The efforts of the accused primarily were related to the corporation of Willis L. Wright & Associates, Inc. The corporation was the alter ego of Mr. Wright, its president. For convenience, the remainder of this opinion will refer to both the corporation and the individual as Wright.

and Thomason came to the accused for advice. The accused explained that there were two options available for enforcement of the covenant not to compete. The first was to demand that Wright enforce the covenant; this would require that Wright file an application for certificate of authority in order to qualify to do business in Oregon. The alternative was for Barnes and Thomason to ask Wright to assign his interest in the covenant to Barnes and Thomason so that they could bring the action against Welling.

Barnes and Thomason were reluctant to request the assignment from Wright. Because of their dissatisfaction with Wright and their feelings that he was not working in the best interests of his franchisees, they did not think that Wright would cooperate. However, their feelings were swayed when the accused explained that if he represented Wright's interests in the Welling matter, he would be unable to represent Barnes and Thomason against Wright in the future if a conflict arose between the franchisees and franchisor. Because Barnes, Thomason and the accused recognized the potential for future problems, Barnes and Thomason decided to encourage Wright to pursue the assignment route.

Thomason telephoned Wright to discuss the Welling matter. Thomason told Wright that he had an obligation to protect his franchisees and to enforce the covenant not to compete. Thomason also told Wright that because of the distance involved Barnes and Thomason preferred that a local Oregon lawyer handle the matter. He gave Wright the accused's telephone number.

On August 27, 1981, Wright and the accused spoke on the telephone regarding the Welling matter. The accused explained to Wright the alternatives available for enforcing the no-competition provision and the advantages and disadvantages of each to Wright; the accused admitted that he was giving Wright legal advice. There was no discussion of the potential for a future conflict of interest. The accused stated that he avoided such a discussion because he felt that it would have violated a confidence of Barnes and Thomason.

On September 1, 1981, the accused wrote a letter to Wright as a follow-up to the telephone conversation. The letter began:

"Dear Mr. Wright:

"I appreciate the opportunity you have given this office of working with you in protecting your interests and the interests of your franchises in the Pacific Northwest."

The letter then proceeded to discuss that the responsibility for payment of attorney fees and costs was to be borne by Wright. The accused again reviewed the alternative theories available to Wright. He also enclosed an application for certificate of authority if Wright chose to bring an action in his own name and an assignment to be completed if Wright instead chose to have Barnes and Thomason bring the action.

The letter encouraged Wright to act quickly "to prevent Mr. Welling from severely damaging [Wright's] operations." The letter did not discuss the potential for future conflicts nor did the accused indicate that Wright should retain his own counsel. The accused simply indicated that Wright should make the choice between legal alternatives and return the documents to the accused. Additionally, the accused suggested that in order to prosecute the Welling matter successfully the accused would require a thorough understanding of UBE operations. At some point Wright responded that the accused should familiarize himself with the operations manual in the possession of Barnes and Thomason.

On September 2, 1981, the accused wrote a memorandum to the file of Wright detailing his concerns about a potential conflict of interest between Wright, and Barnes and Thomason. The memorandum indicated that the accused and his law partners had determined that if Wright agreed to the assignment it would avoid the creation of an lawyer-client relationship with Wright and avoid any potential conflict of interest. When Wright subsequently signed the assignment and mailed $150 in costs, the accused felt that he had protected himself.

Subsequently, the UBE franchisees became increasingly dissatisfied with Wright. In late September 1981, after the assignment but before the filing of the Welling action, Barnes and Thomason asked the accused to determine the legal theories available to void the franchise agreement with Wright. In October 1981, the accused attended a meeting

in Eugene of the UBE franchisees at which the legal problems and potential solutions of all the franchisees were discussed.

On November 4, 1981, the accused filed an action against Welling, with Barnes and Thomason as plaintiffs. On November 19, 1981, the accused filed an action in behalf of Barnes and his wife against Wright praying for declarations by the court that: (1) the franchise agreements should be rescinded; (2) the no-competition agreement was unenforceable against plaintiffs; (3) any trade secrets acquired after entering the agreement were unenforceable against plaintiffs; and (4) Wright's sale of the franchise was in violation of Oregon Securities Law. The complaint also asked for punitive damages.

When Wright was served with summons in the latter case, he sent a letter to the accused. The letter asserted that the accused could not represent Barnes and Thomason because the accused had been retained by Wright in the Welling matter and that it would be a conflict of interest to proceed in an action against Wright. The letter also noted that Wright had already made $1,617.38 in payment to the accused in the Welling matter in response to the accused's payment requests. Wright stated that a copy of the letter was sent to the Oregon State Bar, although such a copy apparently never was received. The letter, other exhibits and testimony disclosed that the accused would send a statement for services rendered to the UBE franchise of Barnes and Thomason. Barnes and Thomason, in turn, would debit its barter credit account with Wright. Barnes and Thomason would then credit the barter account of the accused.

On December 3, 1981, the accused, in response to Wright's letter, wrote to the Bar. The accused explained the situation and requested an opinion as to whether he was violating the Code of Professional Responsibility. An investigation was undertaken. The accused withdrew from representation in both matters and fully cooperated with the Bar.

The Bar's investigation resulted in the issuance of a complaint alleging a violation of DR 5-105(A), concerning conflicts of interest, and a violation of DR 4-101(B), concerning the use of confidential information. The Trial Board found a "technical" violation of DR 5-105(A), but no violation of DR

4-101(B). The Trial Board recommended against formal discipline and suggested that a private letter of admonition should be issued to the accused. The Disciplinary Review Board agreed with the findings of fact, but concluded that the conduct of the accused was more than a "technical" violation. The Review Board recommended a public reprimand.

This court reviews disciplinary proceedings under the procedures in effect at the time that the formal complaint was served.[2] In this case, the applicable statutes provided that after the Disciplinary Review Board files its decision and recommendation, this court may "adopt, modify or reject the same, in whole or in part, and thereupon shall make an appropriate order." Former ORS 9.535(3). We make an independent review of the facts. *In re Thorp,* 296 Or 666, 668, 679 P2d 857 (1984).

## I. DR 5-105

The accused was charged with violating DR 5-105(A) of the Code of Professional Responsibility. At the time of the alleged violation, DR 5-105 provided, in part:

"(A)   A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).

"* * * * *

"(C)   In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation

---

[2] BR 1.5 provides, in part:

"* * *[D]isciplinary * * * proceedings initiated by the service of a formal complaint * * * on an accused * * * prior to January 1, 1984 shall be completed under the rules in effect prior to that date. * * *"

Oregon Laws 1983, chapter 618, section 1, provides:

"ORS 9.525, 9.535, 9.550, 9.560, 9.570 and 9.580 are repealed on January 1, 1984. However, any proceedings pending under ORS 9.525, 9.535, 9.550, 9.560, 9.570 and 9.580 on January 1, 1984, shall be completed as provided in those statutes."

on the exercise of his independent professional judgment on behalf of each."

DR 5-105(A) is expressed in terms of the effect upon the exercise of the lawyer's independent judgment, but it has been consistently interpreted as the applicable rule in conflict of interest cases. *See In re Johnson,* 300 Or 52, 58, 707 P2d 573 (1985); *In re Brandsness,* 299 Or 420, 425, 702 P2d 1098 (1985); *In re Thorp, supra,* 296 Or at 677; *In re Banks,* 283 Or 459, 476-77, 584 P2d 284 (1978).

Through these previous opinions we have attempted to set out an analytical framework to resolve conflict of interest issues. The first step in this framework is the determination of whether a lawyer-client relationship ever existed. If that issue is resolved affirmatively, the next step is the determination of whether the situation involves an "open file" conflict, between present clients, or a "closed file" conflict, between a present client and a former client. The remainder of the analysis is dependent upon this second determination. *See In re Johnson, supra* ("open file" conflict); *In re Brandsness, supra* ("closed file" conflict).

In the present case, the accused argues that no lawyer-client relationship ever was established between himself and Wright and therefore that the alleged violations did not occur. We disagree and find that there was a lawyer-client relationship; we also find that this relationship existed at the same time that the accused undertook to represent Barnes and Thomason in the claim against Wright. This resulted in an "open file" conflict.

A. *Lawyer-Client Relationship.*

A lawyer-client relationship does not always arise, at its inception, from a formalized statement of terms and conditions. The inception of the relationship is often implied from the circumstances. *In re Robertson,* 290 Or 639, 648, 624 P2d 603 (1981); *see also In re Galton,* 289 Or 565, 581, 615 P2d 317 (1980). In the present case, the facts imply that a lawyer-client relationship was established between the accused and Wright. The very first written correspondence from the accused to Wright recognized that the parties would be working together in protecting Wright's interests. The letter also provided Wright with various forms of legal advice, and

set out the arrangements for the billing of attorney fees, costs and disbursements.

The situation here is similar to that in *In re Galton, supra.* In *Galton,* we found a lawyer-client relationship between the accused and Great Western Mortgage Company (GWM) where the principals of GWM called the accused from time to time for advice although he was not on retainer and GWM also employed other counsel. Similarly, in this case, the accused was not placed on retainer by Wright, and the testimony shows that Wright had other counsel in Utah. But the record also reflects that the accused and Wright conferred from time to time, by letter and by telephone, regarding the Welling matter. In *Galton,* we recognized that no magic words are necessary in order to form a lawyer-client relationship. A lawyer need not "be on retainer or engaged for a specific purpose to be considered an attorney for a client who, from time to time, calls that lawyer seeking legal advice and receives such advice as a matter of course." 289 Or at 581.

In *In re Robertson, supra,* we found a lawyer-client relationship between the accused and the sellers in a real property sale. The conflict of interest in that case arose because the accused also represented the purchaser in the sale. We found that the lawyer-client relationship existed where the accused had represented the sellers for 15 to 16 years and had assisted them in other land sale contracts; most importantly, the accused was responsible for drafting the land sale contract and never told the sellers that he was not representing them in the particular transaction. In the present case, as in *Robertson,* the accused provided legal advice to both sides of the transaction and provided the legal documents necessary to allow Wright to elect the procedure for prosecution of the Welling matter. As in *Robertson,* the accused at no time indicated that he was not representing Wright.

■    B.   *"Open File" Conflict.*

We have distinguished between the two basic types of conflict considered under DR 5-105(A). In *In re Brandsness, supra,* we defined these as the "open file" conflict and the "closed file" conflict. The former is concerned with conflicts in the representation of two present clients and the latter is concerned with conflicts that develop as a result of the representation of a present client and the past representation

of a former client. The present case involves two contemporaneous legal actions. The first is the action filed against Welling on November 4, 1981, and the second is the action filed against Wright on November 19, 1981. The result is an "open file" conflict.

■ We next move to the determination of the level of conflict: actual, likely, or unlikely. This determination becomes important because the level of conflict dictates the appropriate action by the lawyer. *In re Johnson, supra,* 300 Or at 58.

In *In re Porter,* 283 Or 517, 523, 584 P2d 744 (1978), we first distinguished between the levels of "open file" conflicts:

> "* * * [I]f the representation of multiple clients is such that the lawyer's independent professional judgment on behalf of one client *will be* adversely affected (an 'actual' conflict), or *is likely to be* adversely affected (a 'potential' conflict), the representation is improper unless the exception provided in DR 5-105(C) applies." (Emphasis in original.)

In later cases, we expanded this distinction and interpreted DR 5-105 to prohibit the representation of clients with *actual* conflicting interests; this prohibition exists regardless of the DR 5-105(C) exception. *See In re Jans,* 295 Or 289, 295, 666 P2d 830 (1983); *In re Johnson,* 300 Or at 58-9.

An actual conflict exists when the accused places himself "in a position where the exercise of his independent professional judgment on behalf of one client would be adversely affected by the differing interests of the other [client]." *In re Porter, supra,* 283 Or at 524. In *Porter,* we found an actual conflict where the accused undertook to represent 14 individuals at the preindictment stage of a single homicide case. While the accused had fully disclosed and explained to each client that there was a potential conflict of interest if any one of them should be criminally charged, he failed to recognize the existence of an actual conflict of interest. The actual conflict existed because of the differing interests of each of the clients. The accused could not freely advise any one client without weighing the disadvantages and consequences to the other clients.

While it may be permissible for a lawyer to represent

more than one interest in a transaction in some instances, "the only ethical position for an attorney to adopt when substantially identical interests which he has represented become divergent is to represent neither [interest]." *In re Banks, supra,* 283 Or at 475. In *Banks,* the two accused lawyers had represented the interests of a closely held family corporation. When intra-family confrontations developed one of the lawyers undertook representation of one faction against the corporation's chief executive in challenging an employment contract. We found this to be inappropriate. "[T]he accused's firm represented both [the chief executive] and the corporation at the time the contract was drawn and * * * it could not subsequently, when the interests of its clients were in opposition, represent either one in a dispute over the application of the contract without the consent of both." 283 Or at 478.

The present case is analogous to *In re Porter;* the accused cannot prosecute the Welling case, an action to enforce the UBE franchise agreement, without considering the effect and consequences on the simultaneous case against Wright, an action to hold the franchise agreement invalid. Likewise, the present case is similar to *In re Banks.* Although the accused here did not initially draft the franchise contract, he was simultaneously involved in attempting to enforce its provisions and attempting to invalidate its provisions. When the accused accepted employment to prosecute the Welling case, he was representing the interests of Barnes and Thomason as franchisees and also Wright and UBE as franchisors. When these identical interests in enforcing the franchise agreement diverged, the accused should not have undertaken representation attempting to invalidate the franchise agreement. The accused created an actual conflict of interest by representing one client and then accepting employment from a second client in a position adverse to the other client. *See In re Thorp, supra,* 296 Or at 680; *In re Brownstein,* 288 Or 83, 87, 602 P2d 655 (1979).

In *Johnson* we concluded that the lawyer must have available some factual predicate suggesting a conflict of interest before he or she will be held accountable for a violation of DR 5-105. *In re Johnson, supra,* 300 Or at 61. The accused in this case was aware, from the beginning of his work on the Welling case, that a conflict of interest could develop between

the franchisee and the franchisor. This knowledge is evidenced by the accused's file memorandum on September 2, 1981. We have repeatedly held that where "there is the slightest doubt as to whether or not the acceptance of professional employment will involve a conflict of interest between two clients * * * the employment should be refused." Wise, Legal Ethics 273 (2d ed 1970), quoted with approval in *In re Banks, supra,* 283 Or at 476, and *In re Johnson, supra,* 300 Or at 60.

We conclude that the accused had knowledge of the facts establishing an actual or likely conflict of interest in the representation of these two actions. We therefore find that a conflict of interest did occur and the accused is guilty of violating DR 5-105(A).

## II. DR 4-101

The accused was charged with violating DR 4-101(B). At the time of the alleged violation, DR 4-101(B) provided, in part:

"(B) Except when permitted under DR 4-101(C), a lawyer shall not knowingly:

"(1) Reveal a confidence or secret of his client.

"(2) Use a confidence or secret of his client to the disadvantage of the client.

"(3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.

"(C) A lawyer may reveal:

"(1) Confidences or secrets with the consent of the client or clients affected, but only after a full disclosure to them.

"(2) Confidences or secrets when permitted under Disciplinary Rules or required by law or court order.

"(3) The intention of his client to commit a crime and the information necessary to prevent the crime.

"(4) Confidences or secrets necessary to establish or collect his fee or to defend himself or his employees or associates against an accusation of wrongful conduct."

The evidence presented by the Bar suggests that

Wright told the accused to obtain a copy of the UBE Operations Manual from Barnes and Thomason and to familiarize himself with that manual. The accused did obtain a copy of the manual. Wright testified that the information in that manual was protected by a non-disclosure provision in the franchise agreement, and franchisees could only disclose the information within a lawyer-client relationship. There is no dispute that the accused was acting as a lawyer for Barnes and Thomason and that they gave him access to the manual.

There was no evidence presented which indicated that the accused revealed the information in the manual to any third person. All the franchisees had access to the same information in their own manuals. The only evidence presented by the Bar is that the accused filed an action against Wright, but there is no indication that information obtained in the Welling matter was used to advance the accused's interest in the action against Wright. The Bar has not proven by clear and convincing evidence that a violation of DR 4-101(B) occurred. *See In re Chambers,* 292 Or 670, 672, 642 P2d 286 (1982).

## III. SANCTION

■   We now turn to a determination of the appropriate sanction in this case. We do this recognizing that the purpose of a sanction is not to penalize the accused, but to protect the public and the integrity of the profession. *See ex parte Finn,* 32 Or 519, 531, 52 P 756 (1898). To meet these objectives it is appropriate, in degrees varying with the disciplinary rule involved, to consider the type of duty violated by the accused, the accused's mental state at the time of the violation, the injuries caused by the violation and the existence of any aggravating or mitigating factors.[3]

---

[3] In February 1986, the American Bar Association (ABA) approved a 1985 ABA publication entitled: *Standards for Imposing Lawyer Sanctions.* This publication recognizes the need for a comprehensive system of lawyer disciplinary sanctions and sets out a model theoretical framework. We have looked to that model for guidance and the factors that we evaluate in this case are based upon the ABA framework which asks the following questions:

"(1) What ethical duty did the lawyer violate? (A duty to a client, the public, the legal system, or the profession?)

"(2) What was the lawyer's mental state? (Did the lawyer act intentionally,

■   The present case involves the violation of a lawyer's duty to a client to avoid conflicts of interest. The accused knew of the surrounding circumstances, was aware of at least a likely conflict of interest and neglected to notify his clients of that likely conflict. The accused's actions represented a potential injury to Wright; had it not been for Wright's complaint and the subsequent Bar investigation, the accused would have continued in his conflicting representation and caused injury to Wright's interests in his franchises.

The final factors to consider are those of aggravation and mitigation. These factors are not implicated in the culpability phase of a disciplinary proceeding but are relevant in the sanctioning phase. In this case the mitigating factors outweigh the aggravating factors.

It is an aggravating factor that the accused has not acknowledged the wrongfulness of his conduct. It is also an aggravating factor that the accused denies that Wright paid for the accused's services. While it may be true that no great amount of cash changed hands, $1,617.38 in barter trade units was subtracted from Wright's account in response to payment requests by the accused. Wright was responsible for payment, whether in the form of cash or trade units.

While those aggravating factors may sway us towards a harsher sanction, the mitigating factors are more impressive. The accused, who is a young lawyer, has no prior disciplinary record. He had graduated from law school approximately two years before this incident. The evidence suggests that he did not intentionally deceive a client, but in fact, believed that he was being as open as possible with Wright without violating any confidences of Barnes and Thomason. Additionally, the accused honestly thought that by obtaining the assignment from Wright he had avoided any conflict of interest which would otherwise have arisen.

The accused was cooperative with the Bar investigation. As soon as the investigation began he withdrew from

knowingly, or negligently?)

"(3) What was the extent of the actual or potential injury caused by the lawyer's misconduct? (Was there a serious or potentially serious injury?) and

"(4) Are there any aggravating or mitigating circumstances?" American Bar Association, *Standards for Imposing Lawyer Sanctions* 5 (1985).

representation in both cases. The Disciplinary Review Board stated that "the Accused more than in almost any case in recent memory, fully cooperated and was honest with the Bar, Bar counsel and the Trial Board. * * * His obvious good faith and integrity in participating in this process are to his credit."

In cases involving similar violations, our sanction has usually been in the form of a reprimand. *See In re Brandsness, supra; In re Thorp, supra; In re Jayne,* 295 Or 16, 663 P2d 405 (1983); *In re Galton, supra; In re Brownstein, supra; In re Porter, supra; In re Banks, supra.* Suspension has only been imposed in those cases involving serious aggravating circumstances. *See In re Robertson, supra* (30-day suspension for "clear and flagrant" violation in the representation of both sides to a real property transaction); *In re Gant,* 293 Or 130, 645 P2d 23 (1982) (30-day suspension where the accused, who had been a lawyer for 25 years, represented the husband in a dissolution case after having represented the wife for the previous seven years).

We find the facts in this case more analogous to the first line of cases than the latter and therefore find that a public reprimand is a sufficient sanction.

The accused is reprimanded. The Oregon State Bar is awarded its actual and necessary costs and disbursements. ORS 9.536(4).