Argued and submitted May 6, accused suspended for 63 days September 16, 1986

In re Complaint as to the Conduct of
# HOWARD R. HEDRICK,
*Accused.*
## (OSB 84-104; SC S32443)
725 P2d 343

William E. Hurley, Portland, argued the cause and filed the brief for the Accused.

William W. Youngman, Portland, argued the cause and filed the brief for the Oregon State Bar.

Before Peterson, Chief Justice, and Lent, Linde, Campbell, Carson, and Gillette, Justices.

PER CURIAM

## PER CURIAM

The Oregon State Bar filed a complaint against Howard R. Hedrick, one of its members, accusing him of unethical conduct in two separate causes.

The First Cause of Complaint alleged a violation of:

"DR 9-102 Preserving the Identity of Funds and Property of a Client.

"(B)   A lawyer shall:

"* * * * *

"(3)   Maintain complete records of all funds, securities and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.

"(4)   Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."

The Second Cause of Complaint alleged a violation of:

"DR 1-103 Disclosure of Information to Authorities.

"* * * * *

"(C)   A lawyer who is the subject of a disciplinary investigation shall respond fully and truthfully to inquiries from and comply with reasonable requests of the general counsel, the local professional responsibility committees, the state professional responsibility board, and the board of governors as requested, subject only to the exercise of any applicable right or privilege."

The trial panel found Hedrick guilty of both causes of complaint and "recommended" that he be suspended from the practice of law for a period of 30 days[1] or until he paid to his

---

[1] The trial panel of the Disciplinary Board is the equivalent of a trial court. It makes decisions and not recommendations. ORS 9.536. The lay member of the trial panel disagreed as to the sanction. He "recommended" that Hedrick be suspended for a period of 60 days and that 30 days of suspension be stayed if the money plus interest was returned to the client.

client the sum of money owed plus interest.[2]

We find Hedrick guilty of both causes of complaint and suspend him from the practice of law for a period of 63 days.

Anna Berliner died on May 13, 1977. She left no children and her husband, Sigfrid Berliner, had predeceased her. Her last will and testament was dated January 24, 1966. Under that will, except for a specific bequest of $1,000, she left her entire estate to "Die Mathematisch-Natur-wissenschaftliche Fakultat der Georg-August-Universitat zu Gottingen" located in Gottingen, Germany "to be used for a research fellowship in mathematics and physics under the name of Sigfrid Berliner."

The First National Bank of Oregon, now the First Interstate Bank, was named and qualified as executor of the estate. The estate was appraised at a value in excess of $500,000. Many of these assets were held by the Commerzbank of Frankfurt, West Germany. A claim was filed against the estate claiming that all the assets should be held in trust under a previous will executed by Anna Berliner in 1957. The claim was based on an alleged agreement between Anna Berliner and her husband, Sigfrid Berliner, to dispose of all their assets on death in accordance with their mutual wills. The trust under the 1957 will was for the benefit of the Berliners' relatives.

The claim was denied, but the subsequent law action was settled. The trustees under the 1957 will agreed to accept one-half of the net assets of the Anna Berliner estate and the University of Gottingen agreed to accept the other half. This settlement was negotiated on behalf of the University by the late Peter Schwabe, a Portland attorney, on a 25 percent contingent fee basis.

There were four partial distributions from the First National Bank to the University or its attorney. The first distribution was in April 1979 in the amount of $50,000. Schwabe kept the money and applied it to his attorney fees.

---

[2] The trial panel's decision is dated December 9, 1985. Hedrick's brief in this court includes by stipulation the copy of a letter from him to his client dated February 14, 1986. The letter recites that Hedrick is enclosing the money in question plus interest, "without admission that anything is owed."

The second partial distribution set up a chain of events which is relevant to the determination of this case. The probate court, at the request of the University, in effect ordered that one-half of the stock held by the Commerzbank of Frankfurt be transferred in kind directly to the University. The value of the stock transferred was $157,265.34. The other one-half of the stock was sold by Commerzbank and resulted in a credit to the Berliner estate in a like amount for the benefit of the trustees. On June 19, 1979, the Commerzbank, instead of sending the First National Bank $157,265.34 for distribution to the trustees, sent the sum of $180,809.18. It was later explained by the Commerzbank that the difference of $23,543.84 represented the sale of bonds and odd lots of stock which could not be divided in kind. The $23,543.84 should have been divided by the First National Bank equally between the University and the trustees—each should have received $11,771.92.

On August 31, 1979, the First National Bank by mistake assumed the sum of $180,809.18 represented an amount equal to the in-kind value received by the University directly from the Commerzbank and distributed the entire $180,809.18 to the trustees.

In September 1979, Peter Schwabe died. Howard R. Hedrick, the accused, took over some of Schwabe's law practice including the representation of the University of Gottingen in the Berliner probate matter. The 25 percent contingent fee arrangement continued between Hedrick and the University.

On April 7, 1980, the First National Bank sent to Hedrick an accounting which showed the initial $50,000 distribution to Peter Schwabe and the $180,809.18 distribution to the trustees. An associate of Hedrick's, based upon the accounting, sent a letter to the University stating that Hedrick's attorney fee of 25 percent was being calculated upon the basis that the University had received $50,000 in cash and $180,809.18 in securities.

On May 20, 1980, the University wrote to both Hedrick and the First National Bank pointing out that it had not received stock directly from the Commerzbank valued at

$180,809.18, but a lesser amount.[3] It also pointed out that the difference represented the sale of bonds and odd-lot securities which should have been divided equally between the University and the trustees. Neither Hedrick nor his associate contacted the First National Bank in an effort to resolve the problem. The First National Bank wrote to the Commerzbank, which replied and confirmed the information contained in the University's letter of May 20, 1980.

On October 3, 1980, the First National Bank sent a corrected accounting to Hedrick and the attorney for the trustees showing the over-distribution to the trustees in the sum of $11,771.92. On January 29, 1981, the trustees acknowledged the over-payment and authorized its repayment. Thereafter, the over-payment was included in subsequent distributions by the First National Bank to Hedrick as attorney for the University.

On December 29, 1981, the third distribution from the Berliner estate in the amount of $49,075.09 was paid to Hedrick as the University's attorney. On February 18, 1982, the fourth and final distribution was made to Hedrick in the sum of $547.92. On March 30, 1982, Hedrick deducted attorney fees in the amount of $20,201.79 from the combined third and fourth distributions and, after deducting costs, remitted the balance to the University. The total attorney fees charged the University by Schwabe and Hedrick was $50,000 plus $20,201.79 or the sum of $70,201.79.

The total of the four distributions made to the University from the Anna Berliner estate was $256,888.35. The combined fee of Schwabe and Hedrick based on 25 percent should have been $64,222.09. In other words, the University was overcharged in the sum of $5,979.70, less costs in the amount of $93.75 for a net of $5,885.95.

The President of the University wrote to Hedrick on May 10, 1982, acknowledging receipt of the final distribution and pointing out the information in his previous letter of May 20, 1980, explaining the First National Bank's error. The

---

[3] The lesser amount set out in the University's letter of May 20, 1980, was $157,216.34. However, in all later correspondence, the University acknowledged that the securities it received from Commerzbank were worth $157,265.34.

President concluded the letter of May 10, 1982, by requesting the payment of the sum of $5,885.95.

On July 15, 1982, the President of the University again wrote to Hedrick requesting the $5,885.95, stating in part: "If you disagree with my computations, as explained in [my letter of May 10, 1982] I would like to know your reasons." On October 21, 1982, the President again wrote to Hedrick demanding the balance and stating: "If you have any objections against our computations, please do explain them."

The University wrote its fourth and final letter to Hedrick on April 22, 1983. It included the following:

> "The *total sum the University received* was *$256,888.35,* of which the estate of Mr. Schwabe was entitled to 25%. This comes up to a fee of $64,222.09. However, you kept $20,201.79 from the final distribution in addition to the $50,000 already received by Mr. Schwabe. *So the total sum kept by Mr. Schwabe and you* comes up to *$70,201.79.* Even after subtracting the expenses indicated in your letter of April 16, 1980 ($93.75), [t]here is a difference of

> *$5885.95*

> that you still owe to the University. I don't think you could have any real objection to this, as you have not yet bothered to explain your mathematics."

> "I am not willing to let this correspondence go on indefinitely. If I have not received a check about the amount stated above by May 31, 1983, I will sue you for this money and at the same time inform the Oregon State Bar Association." (Emphasis in original.)

On September 16, 1983, the University reported the matter to the Oregon State Bar.

On October 3, 1983, the Oregon State Bar sent a copy of the University's complaint letter to Hedrick and asked him to explain his position. Between October 3, 1983, and May 21, 1984, the Bar sent Hedrick five letters asking for his explanation of the University's complaint.

On May 31, 1984, Hedrick wrote to the Bar claiming that the University had received $180,809.18 in securities directly from the Commerzbank and that there was no merit to the University's claim. This letter was forwarded by the Bar to the University for comment. The University replied on

June 25, 1984, and once again explained the basis for its claim of $5,885.95. Its letter included this comment:

"It is strange that Mr. Hedrick after having spent hours on his files, provides you with the old accounting of April 1980 and does not mention the corrected version of October 1980 at all."

On July 17, 1984, Hedrick wrote to the Bar saying in effect that he had little to add to the University's letter of June 25, 1984. He set forth his position as follows:

"This is not an ethical matter in any sense of the word. It is simply a fee dispute which I am not going to be coerced into compromising simply because it has been reported to the Oregon State Bar. The proper forum to resolve this dispute is in the court system at which time an extensive review of all of the relevant documents can be considered."

Thereafter, the Bar referred the University's complaint to the State Professional Responsibility Board which on August 25, 1984, in turn referred the matter to the Multnomah County Local Professional Responsibility Committee.

Martha Hicks, attorney at law, was appointed by the local responsibility committee to investigate the matter. On November 8, 1984, Hicks met with Hedrick at his office and requested copies of his fee agreement, trust account ledger cards, and the First National Bank accounting which he claimed supported his position. The requested documents were not delivered to Hicks at the first meeting.

On November 21, 1984, Hicks wrote to Hedrick again requesting the documents. On November 26, 1984, Hedrick sent Hicks only the ledger card. On December 11, 1984, Hicks sent another letter to Hedrick requesting the accounting information. On January 14, 1985, Hicks wrote to Hedrick as follows:

"I have requested, several times, a copy of the summary sheet which the First Interstate Bank attached to its accounting for the estate of Anna Berliner. I have not received the document and am unable to proceed with my investigation without it. Please supply me with this document within ten days of your receipt of this letter. If I do not receive the document, I will, unfortunately, be forced to subpoena it."

On January 16, 1985, Hedrick answered Hicks as follows:

"If you can cite me the ethics opinion or the provision of the rules for professional conduct that would require me to prove to the ethics committee that I am right in my position or I am acting unethically, I will be pleased to consider this and comply with your request if it is then reasonable. Otherwise, the purpose of your request is improper and I do not feel either compelled or obligated to comply with your request."

On January 21, 1985, Hicks replied that she was investigating a possible violation of DR 9-102(B)(4) and called Hedrick's attention to DR 1-103. On February 12, 1985, Hedrick wrote to Hicks and offered to show the accounting document to her as a "courtesy to you only." On February 28, 1985, Hicks met with Hedrick and was allowed to inspect and copy the accounting document.

On July 30, 1985, the Oregon State Bar filed its complaint accusing Hedrick of violating DR 9-102(B)(3) and (4) in its first cause and violating DR 1-103(C) in its second cause. The gravamen of the first cause is that Hedrick refused to comply with the University's request "for a new accounting or reimbursement of the excess attorney fees charged despite numerous requests by the University of Gottingen between May 1980 and May 1985." In the second cause the Bar alleged that Hedrick failed to respond fully to its inquiries between October 1983 and August 1984 as to the University's complaint and also failed to respond fully to the requests of Martha Hicks of the local responsibility committee during her investigation.

Hedrick's answer to the Bar's complaint is somewhat rambling and disjointed, but includes the following defenses: (1) He furnished an accurate accounting to the University which showed that the attorney fees charged were correct; (2) The matter is a fee dispute and not an ethical matter; (3) Peter Schwabe's long-time secretary has worked in Hedrick's office since Schwabe's death and it is her and Hedrick's opinion that they have accurately accounted to the University of Gottingen; (4) The application of the disciplinary rules is inconsistently invoked; (5) To the best of Hedrick's knowledge "complete responses to all inquiries were furnished."

On November 26, 1985, a hearing was held before the trial panel and on December 9, 1985, that panel issued its

"FINDINGS OF FACT, CONCLUSIONS OF LAW AND DISPOSITION." It found Hedrick guilty of both causes and "recommended" that he "be suspended from the practice of law for a period of thirty (30) days or until he has returned to his client the sum of $5,885.95 plus interest."

The Oregon State Bar petitioned this court for review requesting that Hedrick be suspended from the practice of law for 30 days without condition. It asks that we reject the trial panel's "recommendation that the suspension be stayed upon return of the excess fee." Hedrick appears in this court as the respondent. However, on oral argument Hedrick's counsel indicated that Hedrick would have petitioned this court for review if the Oregon State Bar had not "beaten him to the punch" and petitioned for review first. Consistent with that position, Hedrick's brief in this court requests that the Bar's complaint be dismissed because "this is not a disciplinary matter, but a fee dispute."

■ Our review is *de novo*. ORS 9.536(3). The Bar has established Hedrick's misconduct by clear and convincing evidence and we find him guilty of both causes.[4]

Hedrick and his associate cannot be faulted for their first letter to the University based upon the First National Bank's accounting of April 7, 1980. When the Commerzbank forwarded to the First National Bank the sum of $180,809.18 without specifically identifying the source of the money, everyone on this side of the Atlantic "jumped offside." It was not until the University's letter of May 20, 1980, that Hedrick was put on notice of the correct value of the securities transferred directly from Commerzbank to the University. From that point forward, Hedrick continued to maintain that the First National Bank's original accounting of April 7, 1980, was correct. This was in spite of numerous demands by his client and the First National Bank's corrected accounting of October 3, 1980. Hedrick ignored the corrected accounting even though the trustees, under the the 1957 will, accepted it and authorized the repayment of $11,771.92. Hedrick's conversation turned to action on March 30, 1982, when his deductions from the third and fourth distributions included

---

[4] BR 5.2 provides: "The Bar shall have the burden of establishing misconduct by clear and convincing evidence."

$5,885.95 in unearned attorney fees. At that point, Hedrick had violated DR 9-102(B)(3) in that he had failed to render an appropriate account to the University of funds that had come into his possession. He also violated DR 9-102(B)(4) because he did not promptly pay to the University funds in his possession which the client was entitled to receive.

This is not a fee dispute. The trial panel said: "There is no evidence supporting Hedrick's position or his suspicions that his client was dishonest or attempting to cheat him out of any fee." We agree.

No further comment is necessary to demonstate that by failing to reply to the letters of the Oregon State Bar and to the inquiries of the representative of the local committee Hedrick violated DR 1-103(C).

■ This brings us to the question of a proper sanction in this case. Recently in the case of *In re Bristow,* 301 Or 194, 206, 721 P2d 437 (1986), we cited *Ex parte Finn,* 32 Or 519, 531, 52 P 756 (1898), for the proposition that "the purpose of a sanction is not to penalize the accused, but to protect the public and the integrity of the profession." We also said:

> "To meet these objectives it is appropriate, in degrees varying with the disciplinary rule involved, to consider the type of duty violated by the accused, the accused's mental state at the time of the violation, the injuries caused by the violation and the existence of any aggravating or mitigating factors." *In re Bristow, supra,* at 206.

We hold that the violations by Hedrick were extremely serious. Any time an attorney withholds from a client money to which the attorney is not entitled, the integrity of the whole profession is at stake. The University first called attention to the problem by its letter of May 20, 1980, and did not get the money until it received Hedrick's letter of February 14, 1986. (See footnote 2 *supra.*) It is doubtful that, short of litigation, the University would have ever received the $5,885.95 if the Oregon State Bar had not intervened. It was also fortunate from the University's standpoint that it had on its faculty a teacher of comparative law who had obtained a Master's degree from the University of California at Berkeley. He advised and prepared the letters for the President's signature. But for this faculty member, the University might

have been discouraged from pursuing the matter because of the distance and the language barrier.

When an attorney fails to cooperate with the Bar in answering questions about a complaint, the whole process is delayed and prejudiced.

Hedrick did not know of the First National Bank's error until his receipt of the University's letter of May 20, 1980. His mental attitude must be judged from that time forward. He has always maintained that he has accounted for and withheld the correct attorney fees. This is in spite of the documentary evidence to the contrary. The trial panel in its findings of fact found that there was no documentary evidence to support Hedrick's position and that "his explanation is at best strained and supported only by his suspicion." We agree. Hedrick never changed his position, and when he forwarded the $5,885.95 plus interest to the University on February 14, 1986, he did so "without admission that anything is owed."

The next factor to be considered is "injuries caused by the violation." There was a delay of approximately four years before the University received the money it was entitled to have in its possession. Interest was paid. It may or may not have made the University whole. Injury to the victim is not a strong plus or minus factor in determining the sanction in this case.

There are no mitigating circumstances in this case unless Martha Hicks' eventual receipt of the information she requested after five letters, or the University's eventual receipt of its money plus interest four years after its first request are considered mitigating circumstances. If Hedrick's plan was to delay, he was partly successful. He "stonewalled" the University from May 1980 until the Bar filed its complaint in July 1985, and he did the same to the Bar and Martha Hicks through five request letters each.

In both *In re Bristow, supra,* and *In re Vaile,* 300 Or 91, 707 Or P2d 52 (1985), we found mitigating circumstances existed because the accused lawyer was young and inexperienced. In *In re Bristow, supra,* we specifically mentioned that the accused had no prior disciplinary record. These are not factors here. Hedrick was admitted to practice in 1962. His letterhead on February 14, 1986, stated that he is a "Civil

Trial Specialist." He was given a public reprimand by this court in 1971 for a conflict of interest violation. *In re Howard R. Hedrick,* 258 Or 70, 481 P2d 71 (1971).

We suspend Hedrick from the practice of law for a period of 63 days. The Oregon State Bar to recover costs.