Argued April 19, reversed with instructions May 28, 1971

ANDROS, *Respondent, v.* DEPARTMENT
OF MOTOR VEHICLES, *Appellant.*

485 P2d 635

*Al J. Laue,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the briefs were Lee Johnson, Attorney General, and Jacob B. Tanzer, Solicitor General, Salem.

*LaVerne M. Johnson,* Corvallis, argued the cause for respondent. With him on the brief were Thomas & Johnson, Corvallis.

Before SCHWAB, Chief Judge, and LANGTRY and FOLEY, Judges.

FOLEY, J.

The Department of Motor Vehicles (now Motor Vehicles Division) suspended petitioner's operator's license for refusal to submit to a chemical test of his breath as provided for by ORS 483.634. Pursuant to ORS 482.560 petitioner appealed the suspension to the Circuit Court of Benton County. This is an appeal by defendant Department of Motor Vehicles from a judgment of the Benton County Circuit Court entered on a jury verdict in favor of petitioner Andros.

At the conclusion of the case before the circuit court, the Department moved for a directed verdict on the basis that the necessary elements authorizing the suspension of petitioner's operator's license were not contradicted by any of petitioner's evidence, but on the contrary were reinforced by his testimony and evidence; in other words, that the evidence would admit of no reasonable inference but that the officer had reasonable grounds to believe that the petitioner had been operating his automobile while under the influence of intoxicating liquor. ORS 483.634 (1). Petitioner contends (1) that the evidence permits a reasonable inference that the police officer did not have reasonable grounds to believe that the petitioner had been driving under the influence of intoxicating liquor when the police officer requested that petitioner submit to the test, and (2) that the evidence showed that the police officer did not file a "sworn report" of the refusal with the Department. ORS 483.634 (2).

When the petitioner appealed from the administrative ruling of the Department of Motor Vehicles suspending his driver's license for his refusal to take the breathalyzer test, he bore the burden of proving by a preponderance of the evidence that his license was

wrongfully suspended. *Thorp v. Dept. of Motor Vehicles,* 4 Or App 552, 480 P2d 716 (1971). However, the motion for directed verdict, which was made after all the evidence was in and both parties had rested, requires that the evidence be considered in the light most favorable to petitioner and petitioner be accorded the benefit of every favorable inference that may be drawn from the evidence. *Young v. Crown Zellerbach,* 244 Or 251, 417 P2d 394 (1966).

Petitioner himself called the police officer as a witness. The officer's testimony relative to Andros's operation of his vehicle and his appearance and performance, even when viewed in the light most favorable to Andros, is damning. The officer testified that in response to information of erratic driving of an automobile west of Corvallis he came upon the petitioner operating his vehicle and followed him for about a mile,

"* * * during which time I noticed this vehicle was being driven erratically and then it would pass onto the center line and back to the paved shoulder in a swerving manner. After approximately a mile I activated the red light on the patrol unit and attempted to stop the driver and at this time the driver failed to stop and failed to respond. I immediately then, by using the lights, the headlights of my vehicle I flashed them from high beam to low beam and during this time the red light was still activated and the driver of the vehicle, however, failed to respond. As we reached the location on Highway 99 W near the junction of Mountain View Drive, there is a sweeping blinding curve to the left and the vehicle ahead of me upon entering this curve, the vehicle was driven into the northbound lane of traffic and the driver of that vehicle immediately cut back from the northbound lane of traffic across the center onto the southbound lane

at a sharp angle onto the paved shoulder. I continued to follow this vehicle and I was attempting to get it stopped and at a point, I would say, about one and a half miles further down the road on 99 W with the red light and the siren and the headlights of my vehicle activated, the driver stopped. * * *"

The only testimony of the officer with reference to petitioner's appearance and condition is likewise unfavorable to petitioner:

"* * * At this time, then, he was asked to depart from the car, which he did. We then went to the front of his car, at which time certain tests— sobriety tests were asked of him. The first test was the heel to toe test, which I explained to him, that I would like for him to place the heel of his foot to the toe of the opposite foot and walk the straight line as much as possible down the solid white line on the paved highway. At the time he did this, however, what I noticed at that time was that he would sway off of the white line and he was not walking in a straight line and one foot would go way off to one side of the line and the other foot to the other side. He was walking toward his vehicle at this time and he was using the aid of his lights on his car as well as my shining my flashlight on the ground right in front of him and upon him reaching his car he stumbled, catching himself once on the right rear fender—excuse me, right front fender and he was then again asked by me to turn around and walk back toward me in the same manner, at which time, I again noticed that he was swaying and not walking in a straight line and his right foot was over the right side of the white line and the left over to the left and after this test was conducted I then asked the driver if he would stand first on his right foot and then on his left foot with his arms to his sides and at this time the driver of the car would stand on his right foot and started to support himself with the opposite foot to keep from falling down. After this test was conducted I then

asked the person to conduct the finger to nose test, which I explained to him and he placed his left index finger and right index finger on the tip of his nose and I then again asked him if he would do the same test, however, this time with his eyes closed at which time the results I noticed was that the finger—the right and left index finger—were off center and up toward the top of his nose. * * * At that time I informed the driver of the car, Mr. Andros, that he was under arrest for operating a motor vehicle while under the influence of intoxicating beverage, after which time he was placed in the front seat of my patrol unit.

"* * * * *

"* * * At the time I was compiling this information for this report I noticed certain conditions of the subject; that I could smell a moderate amount of alcohol on his breath. That his face was flushed. That his clothes was mussed and disarranged and his shirt tail was hanging out and his pants were unzipped—his pants were zipped at the time we arrived at the jail, however, at the time he got out of the car they were unzipped and I informed him of the matter and he took care of it. His attitude during all this time was polite and cooperative. His eyes were blood shot. His balance I noticed as swaying and wobbling. His walk was swaying and stumbling. His turning was swaying and uncertain. The finger to nose test, as I explained, with his right, was uncertain and his finger ended up toward the top of his nose. I did not instruct him to pick up any coins and his speech, I noted as being fair. * * *"

Petitioner himself took the witness stand and did not deny that he had been driving in an erratic manner. He was asked about his physical condition at the time of his arrest:

"Q Will you relate to the jury your physical

condition at or about the time you were arrested by the officer?

"A  Yes. I was very very fatigued, which I had admitted many times and I was very tired, as tired as I had ever been and again, Mr. Burright stated he was following me for over a mile and if he did I was asleep, because the moment I saw the red lights I pulled off the road and he came over to see me."

And about the tests administered by the police officer he testified:

"A  Yes. Mr. Burright came over and he did ask me for my driver's license and I tried to take it out and my driver's license, I have a picture of my daughter with it in there and I had trouble getting it out—and I noticed he had trouble getting some things out of his billfold awhile ago—and I finally got my driver's license out and he read it and he asked me to get out of the car and he did proceed with the tests that he mentioned in his statement up here and again in his opinion maybe I was stumbling but in my opinion—

"MR. PRESTON: It is not responsive to the question.

"MR. JOHNSON: I agree, it is not responsive, but just relate to us what was done, not your opinions about it.

"THE WITNESS: I took the tests that he gave me."

This was on the direct examination of petitioner Andros, and he was not asked further what his own version would be as to whether he stumbled or otherwise how he accomplished the tests.

Petitioner's own physician who saw him approximately one and one-half hours after the policeman stopped him testified:

"I felt at the time that I examined Mr. Dee

Andros that he was not under the influence of alcohol."

He testified to giving Andros certain dexterity tests which the doctor stated he performed successfully[1] but he did not testify as to Andros's physical appearance and thus left uncontradicted the officer's testimony that petitioner's eyes were bloodshot, his face flushed, and his clothes mussed and disarranged.

The testimony of petitioner's other witnesses minimized the amount of alcohol he had ingested before leaving the Henry Thiele's Restaurant At The Dunes in Lincoln City at approximately 12:30 a.m. but did not contradict the testimony of the officer as to Andros's apparent physical condition at the time he was observed commencing shortly after 3 a.m.

In summary, the testimony introduced by petitioner admits of no other reasonable inference than that the police officer, at the time he requested the breath test, had reasonable grounds to believe that petitioner had been driving under the influence of intoxicating liquor.[2] Thus, unless for another reason it should have been denied, the Department was entitled to a directed verdict in its favor.

Petitioner's other contention is that the police officer did not file a "sworn report" with the Department and that whether the report filed was in fact a

[1] "Part of my examination * * * I ask[ed] him to stand first on one foot and then the other for a period of a few seconds —perhaps 5 to 6 seconds—which with his eyes closed and he was able to perform this test first on one foot and then on the other in what I considered a normal fashion, in other words, without falling over. * * *"

[2] As we said in *Thorp*, the test is not whether petitioner was, in fact, under the influence of intoxicating liquor, but whether "an officer has reasonable grounds to believe that the physical condition is a result of alcohol." 4 Or App at 561.

"sworn report" was a jury question. ORS 483.634 (2) requires that the officer "prepare a sworn report of the refusal [to submit to the breath test] and cause it to be delivered" to the Department. The portion of the report referring to the signing and verification thereof is as follows:

"That this report was prepared and furnished pursuant to the requirements of ORS 483.634.

Signature and Title Larry A. Burright, Deputy
    BCSO:                      Larry A. Burright

Department/Agency Benton County Sheriff's Office

Precinct/City/Town Corvallis, Oregon

Subscribed and sworn to before me this 4th day of August, 1969.

(SEAL)

    NOTARY PUBLIC (etc.)  Beulah E. Hickman

    My Commission Expires Oct. 5, 1969"

On its face, then, the report is in proper form.

It is uncontradicted that at the time Officer Burright executed the report before the notary public, he was not formally sworn. The officer testified that the notary public did not swear him "as this jury was sworn, by that I mean with the hand raised," nor did she go through any formalities of causing him to be sworn prior to or immediately following the signing. Neither did the notary ask if the contents of the document were "the truth, the whole truth and nothing but the truth" nor did the officer say to her "without her inquiring, that I swear to you that this is the truth, the whole truth and nothing but the truth." However, on cross-examination the officer testified as follows:

"Q  And the purpose of discussing it with Mrs. Hickman—how did you go about that?

"A  By entering her office and going to her

desk I informed Mrs. Hickman that I had an Affidavit—a sworn Affidavit of the refusal to take the breath test by Mr. Dee Andros and I needed her to notarize my signature to make it valid.

"Q Now, you did discuss this report with her, you say, for a period of time?

"A The report and the particulars of the case.

"Q And what was the purpose and gist of this discussion?

"A The purpose was to inform Mrs. Hickman what the particulars of the arrest were and what facts I had noticed. The reason for me being in her office was to have the sworn Affidavit notarized by her. The report was read by me and looked at by her and discussed in length.

"Q You read the entire report to her?

"A We read it together, sir.

"Q Was that the entire form?

"A Yes, it would have been, sir."

The notary testified:

"THE WITNESS: I notarized this for Mr. Burright on the 4th day of August.

"MR. PRESTON: Q Now, prior to notarizing that, can you tell us whether or not you had any discussion with him in regard to the contents of that report?

"A I did.

"Q And would you tell us the gist of that conversation as best you can recall?

"A I was already familiar with the report and so I discussed this with Officer Burright, as to whether this was the thing he wished to do, and this was his statement.

"Q Did you discuss with him as to whether or not this was a truthful statement?

"A Yes.

"Q    And did he sign that in your presence?
"A    Yes, he did.

"Q    And you notarized it in his presence?
"A    I did."

The circuit court sustained an objection to a question regarding the officer's intention when he executed the document and the Department made an offer of proof. The officer made an ambiguous statement about his feeling being similar to that he would have if he were to sign a contract, but the essence of the Department's offer of proof was:

"Q    [to Officer Burright] Can you tell us whether or not it was your intent that this be a sworn report when you presented it before Mrs. Hickman and signed it in her presence?
"A    Yes, this is correct.

"Q    And she notarized it as your sworn statement?
"A    This is correct."

"Q    [to the notary] Mrs. Hickman, when you and Mr. Burright went over this report form, which is captioned 'sworn report', and based upon your conversations with Mr. Burright and his conversations with you, can you tell us whether or not it was his intent, as you understood it at that time that you signed this that this was to be a sworn report?
"A    That is true.

"Q    Was there any equivocation?
"A    None.

"Q    Did you have any equivocation of any kind that you comprehended in any manner that this was not a sworn report?
"A    None whatsoever.

"Q    And all of the details of the report were gone over in your discussion with him?
"A    That is true."

■ The facts with reference to the execution of the report and jurat were not controverted. Thus, there is no factual dispute about the execution of the "sworn report." In that posture the determination of the legal effect of the procedure followed became one of law for the court and should have been determined by the trial court upon the motion for a directed verdict.

■ The ordinary mode of administering an oath is set forth in ORS 44.330:

> "An oath may be administered as follows: The person who swears holds up his hand, while the person administering the oath addresses him: 'You do solemnly swear that the evidence you shall give in the issue (or matter) now pending between ........ and ........ shall be the truth, the whole truth and nothing but the truth, so help you God.' If the oath is administered to any other than a witness, the same form and manner may be used."

However, invariable observance of the mechanics set forth in the statute is not required. Oregon Constitution, Art. I, § 7 provides:

> "The mode of administering an oath, or affirmation shall be such as may be most consistent with, and binding upon the conscience of the person to whom such oath or affirmation may be administered."

It has been held in Washington under a substantially identical statute and constitutional provision that the word "may" in the statute should not be construed to mean "must," as such construction would render the statute invalid as violating the constitutional provision. *State v. Collier*, 23 Wash 2d 678, 162 P2d 267 (1945). In *Ex Parte Finn*, 32 Or 519, 525, 52 P 756, 67 Am St R 550 (1898), our Supreme Court held that the oath could either be administered by the notary to the af-

fiant or "asseveration must be made to the truth of the matters contained in the affidavit, by the party making it, to the officer, with his sanction." To asseverate means to affirm or aver positively or earnestly. We think the procedure here followed between the affiant and the notary amounted to an earnest, positive averment by the affiant as to the truth of the matter contained in the statement and acceptance thereof as such by the notary, which resulted in a "sworn report" within the meaning of the statute. We are in no way suggesting that the statute setting forth the normal procedure in the administration of an oath should not be followed in every appropriate case. It would have been better to have followed it in this case. But we point out that it does not contain the only process through which a valid jurat may be produced.

We hold, therefore, that a "sworn report" was filed with the Department, as required by the statute, and the trial court should have so determined upon the motion for directed verdict.

Reversed with instructions to enter judgment for defendant.