# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Bradley Sanders, Petitioner,

v.

South Carolina Department of Motor Vehicles and Columbia Police Department, Respondents below,

Of whom South Carolina Department of Motor Vehicles is the Respondent.

Appellate Case No. 2019-000693

––––––––––

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

––––––––––

Appeal from the Administrative Law Court
S. Phillip Lenski, Administrative Law Judge

––––––––––

Opinion No. 27990
Heard May 21, 2020 – Filed September 2, 2020

––––––––––

## AFFIRMED

––––––––––

Heath Preston Taylor, of Taylor Law Firm, LLC, of West Columbia, for Petitioner.

Frank L. Valenta Jr., Philip S. Porter, and Brandy Anne Duncan, all of the South Carolina Department of Motor Vehicles, of Blythewood, for Respondent.

––––––––––

**CHIEF JUSTICE BEATTY:**  The South Carolina Department of Motor Vehicles (DMV) suspended the driver's license of Bradley Sanders (Sanders) pursuant to South Carolina's implied consent statute after he refused to take a blood-alcohol test following his arrest for driving under the influence (DUI).  The suspension was upheld by the Office of Motor Vehicles and Hearings (OMVH), the Administrative Law Court (ALC), and the court of appeals.  *See Sanders v. S.C. Dep't of Motor Vehicles*, 426 S.C. 21, 824 S.E.2d 454 (Ct. App. 2019).  We affirm.

## I.  FACTUAL/PROCEDURAL BACKGROUND

On November 21, 2012, at approximately 4:10 a.m., the Columbia Police Department dispatched an officer to Whaley Street after a single vehicle ran off the road and struck a tree.  Upon arrival, the officer found Sanders standing nearby at a gas station, bleeding from the head.  The officer questioned Sanders and noticed that he slurred his words, had an odor of alcohol, and appeared to be "off-balance," both physically and mentally.  Sanders denied being in an accident, but his personal belongings and blood were found inside the wrecked vehicle, and he could not explain how he injured his head.  Sanders was taken by ambulance to a hospital emergency room, where he was found to have extensive head and neck injuries.

The officer advised Sanders of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and informed him that he was under arrest for DUI.  The officer also gave Sanders notice, both verbally and in writing, of his rights under South Carolina's implied consent statute. *See* S.C. Code Ann. § 56-5-2950 (2018) (implied consent law).  A hospital employee indicated to the officer that Sanders was unable to submit to a breath test.  As a result, the officer asked Sanders to take a blood-alcohol test.  Sanders refused.  No blood sample was collected.

The DMV issued a Notice of Suspension to Sanders informing him that it had suspended his driver's license for refusing to submit to testing in accordance with the implied consent statute.  Under the statute, the South Carolina General Assembly has declared that "[a] person who drives a motor vehicle in this State is considered to have given consent to chemical tests of the person's breath, blood, or urine for the purpose of determining the presence of alcohol, drugs, or the combination of alcohol and drugs, if arrested for an offense arising out of acts alleged to have been committed while the person was driving a motor vehicle while under the influence of alcohol, drugs, or a combination [thereof]." *Id.* § 56-5-2950(A).

Sanders challenged the license suspension in a contested case hearing before the OMVH.  The issue before the OMVH centered on whether Sanders had refused

to submit to a test pursuant to section 56-5-2950.  Because Sanders was asked to submit to a blood test, the hearing more specifically focused on whether the officer was justified in requesting a blood sample because licensed medical personnel had determined Sanders was unable to submit to a breath test.[1]

The officer testified that he requested the blood sample after a hospital employee indicated Sanders was unable to submit to a breath test.  The officer stated he personally observed the employee in the emergency room and saw that she wore a hospital identification badge that identified her name and title as "Angela Albright, RN."

The officer also provided a one-page, standardized form, the "South Carolina Law Enforcement Division - Urine/Blood Collection Report" (SLED Report), which documented the officer's investigation.  The officer indicated on the form that Sanders had been arrested for an offense related to intoxication and was advised of his implied consent rights.  There was also a section for completion by licensed medical personnel, which contained alternative statements describing whether blood and/or urine samples had been sought or collected.  The following statement was marked regarding Sanders:

> A blood sample is requested by the arresting officer because a licensed medical person has informed the officer that the subject is unable to take a breath test at this time due to any reason deemed acceptable by that licensed medical person.

In the line designated for "Name and [Title] of Licensed Medical Personnel," Nurse Albright wrote in "Angela Albright, RN," and she signed on the line reserved for "Signature of Licensed Medical Personnel."  The officer signed the bottom of the

---

[1] Under the implied consent law, a motorist "first must be offered a breath test to determine the person's alcohol concentration."  S.C. Code Ann. § 56-5-2950(A).  However, an officer may request a blood sample "[i]f the person is physically unable to provide an acceptable breath sample because the person has an injured mouth, is unconscious or dead, *or for any other reason considered acceptable by the licensed medical personnel*."  *Id.* (emphasis added).  "If the officer has reasonable suspicion that the person is under the influence of drugs other than alcohol, or . . .  a combination of alcohol and drugs, the officer may order that a urine sample be taken for testing."  *Id.*

form, documenting that his request for a blood sample had been "Refused." Sanders also signed to confirm that he received a copy of the SLED Report.

Sanders's counsel objected to the SLED Report stating that, although Nurse Albright "may well be a registered nurse," he could not determine whether she actually was one because she was not there to cross-examine as to her credentials, and anyone "can have hospital garb on," citing *State v. Frey*, 362 S.C. 511, 608 S.E.2d 874 (Ct. App. 2005).[2] Sanders's counsel also argued he should be able to cross-examine Nurse Albright as to her reason *why* Sanders could not take a breath test (he noted the underlying reason was not specified on the SLED Report). Sanders's counsel asserted the officer's testimony on these points would be hearsay.

The officer reiterated that he personally witnessed Nurse Albright wearing a hospital identification badge with her name and the designation of her title as "RN" and saw her performing her duties in the emergency room. He also noted that Nurse Albright had identified her hospital title on the SLED Report as "RN." The officer lastly added that he was told that the reason *why* Sanders could not supply a breath sample was because Sanders "would not be able to get out [of the hospital emergency room] in a timely manner in order to provide that breath sample." *See* S.C. Code Ann. § 56-5-2950(A) ("A breath sample taken for testing must be collected within two hours of the arrest."). No contemporaneous objection was made by Sanders's counsel to the officer's additional statement regarding the underlying reason *why* medical personnel found Sanders could not provide a breath sample (the inability for Sanders to be discharged from the emergency room within the two-hour time limit).

Sanders's counsel provided the officer with a copy of Sanders's medical records and asked him to recite for the record the portions that counsel had highlighted about Sanders's diagnosis and symptoms. The officer read the portions stating Sanders was diagnosed with "[s]calp contusions, scalp laceration[s], cervical strain, and [a] closed head injury," and that the common symptoms of a head injury could include, among other things, dizziness, headaches, and "slow bleeding or other problems inside the head." Sanders's counsel asked the officer, "Does it sound like

---

[2] In *Frey*, the motorist challenged the admission of his blood alcohol test results at his criminal trial on a DUI charge, and the court of appeals held a hospital employee wearing generic scrubs with no indication of his position at the hospital was not shown to be licensed medical personnel.

he may have had a concussion and was out of it?"  The officer declined to discuss this point.

Sanders then testified as to his injuries and medical condition following the accident.  At his counsel's urging, Sanders also recited the findings in his medical records, confirming he was diagnosed with "[s]calp contusions, scalp lacerations, cervical strain, and [a] closed head injury."  Sanders testified that he "had no clue" what happened after the accident and "was very disoriented," and he stated he did not recall being in the hospital or being asked to submit a blood sample.  During cross-examination, Sanders conceded that he went to Five Points at approximately 1:00 a.m. the night of his arrest and "probably had two [alcoholic drinks], maybe part of a third" before his one-car accident shortly after 4:00 a.m.  Sanders stated that the last thing he remembered was driving down the street towards the tree, and the rest of the evening was very "fuzzy" and "foggy," as the only other thing he recalled was waking up in jail with blood encrusted in his hair.

During closing remarks, Sanders's counsel made a general request to renew his hearsay objection.  In the alternative, counsel asserted Sanders had "absolutely no knowledge of what was going on" after the accident because Sanders "had a significant head injury, had a concussion" and he did not "remember anything until he woke in jail the next morning" with "blood all over the back of his head."

The OMVH issued a written order upholding the suspension.  The OMVH found Sanders was lawfully arrested for DUI and was advised of his implied consent rights.  The OMVH found the officer made a reasonable request for a blood sample after being informed by licensed medical personnel that Sanders was unable to submit to a breath test.  The OMVH noted Sanders had argued this information was hearsay because he did not know if Nurse Albright was an RN and he did not have the opportunity to question her as to the reason why she made this finding.  The OMVH "conclude[d] that the testimony was not hearsay because it was not admitted to prove that [Sanders] was actually unable to leave, only that the blood test was warranted because licensed medical personnel determined he was unable to provide a breath sample."  The OMVH further concluded that the officer "presented a prima facie case that the person who told him and signed the form [the SLED Report] was licensed medical personnel - she was in the hospital, treating patients, represented herself as a nurse, and wore a name tag that indicated she was a registered nurse," and Sanders made no attempt to refute this evidence.

Sanders sought review by the ALC, which affirmed the OMVH's ruling and upheld the suspension of Sanders's driver's license.  The court of appeals affirmed.

*Sanders v. S.C. Dep't of Motor Vehicles*, 426 S.C. 21, 824 S.E.2d 454 (Ct. App. 2019). This Court granted Sanders's petition for a writ of certiorari.

## II. STANDARD OF REVIEW

The South Carolina Administrative Procedures Act establishes the "substantial evidence" rule as the standard for judicial review of a decision of an administrative agency. *Lark v. Bi–Lo, Inc.,* 276 S.C. 130, 133, 276 S.E.2d 304, 305 (1981). The appellate court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact, but may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings or conclusions are affected by an error of law, clearly erroneous in view of the substantial evidence in the record, or are arbitrary, capricious, or characterized by an abuse of discretion. *Peake v. S.C. Dep't of Motor Vehicles*, 375 S.C. 589, 594, 654 S.E.2d 284, 287 (Ct. App. 2007).

## III. DISCUSSION

Sanders contends the decision of the court of appeals should be reversed due to a lack of substantial evidence in the record to support the suspension. Specifically, Sanders argues the court of appeals erred in (1) determining there was substantial evidence that Nurse Albright qualified as licensed medical personnel, and (2) holding the statements used to establish his alleged inability to submit to a breath test were not hearsay. We disagree. We begin with an overview of the remedial purpose of the implied consent statute, along with a consideration of the proper scope of a civil suspension hearing, as we believe these two points provide the appropriate framework for our decision.

### A. Remedial Purpose of Implied Consent Statute

"Being licensed to operate a motor vehicle on the public highways of this state is not a property right, but is merely a privilege subject to reasonable regulations under the police power in the interest of the public safety and welfare." *Peake*, 375 S.C. at 595, 654 S.E.2d at 288. "The implied consent laws are driven by public policy considerations." *S.C. Dep't of Motor Vehicles v. Nelson*, 364 S.C. 514, 522, 613 S.E.2d 544, 548 (Ct. App. 2005).

"One immediate purpose of the implied consent statute is to obtain the best evidence of a driver's blood alcohol content at the time when the arresting officer reasonably believes him to be driving under the influence." *Leviner v. S.C. Dep't of Highways & Pub. Transp.*, 313 S.C. 409, 411, 438 S.E.2d 246, 248 (1993); *see*

*Skinner v. Sillas*, 130 Cal. Rptr. 91, 95 (Ct. App. 1976) (stating the purpose of the statute is to take the test soon after arrest because "alcohol in the blood system dissipates quickly").

It also promotes traffic safety by expeditiously removing dangerous drivers from the public roadways in a summary civil procedure. *See Nelson*, 364 S.C. at 522, 613 S.E.2d at 548 ("The State has a strong interest in maintaining safe highways and roads."); *see also Krueger v. Fulton*, 169 N.W.2d 875, 878 (Iowa 1969) ("It is obvious the purpose of the Implied Consent Law is to reduce the holocaust on our highways part of which is due to the driver who imbibes too freely of intoxicating liquor. The civil license revocation provided for under the Implied Consent Act was intended to protect the public from the irresponsible driver and not merely punish the licensee." (citation omitted)).

"An operator of a motor vehicle in South Carolina is not required to submit to alcohol or drug testing; however, our legislature has clearly mandated that should one choose not to consent to such testing, his or her license must and shall be suspended . . . ." *Nelson*, 364 S.C. at 522, 613 S.E.2d at 548. "Were drivers free to refuse alcohol and drug testing without suffering penalty, the current system of detecting, testing, and prosecuting drunk drivers would simply fail." *Id.* at 522, 613 S.E.2d at 548–49.

The South Carolina General Assembly has imposed a greater length of suspension for refusing to consent to testing than for those who take a test and have an alcohol concentration below a certain threshold and have no prior convictions. *Id.* at 522, 613 S.E.2d at 549. "The disparity in suspensions demonstrates the legislative concern over an individual['] refusal to consent to testing." *Id.* at 523, 613 S.E.2d at 549; *cf. Quintana v. Mun. Court*, 237 Cal. Rptr. 397, 401 (Ct. App. 1987) ("The purpose of the implied consent statute is to fulfill the need for a fair, efficient and accurate system of detection and prevention of driving under the influence. That purpose is obviously thwarted by the inebriated driver who refuses the test. . . . He has thus proven to be more dangerous to the public than the inebriated driver who has consented to a test." (citations omitted)).

A civil license suspension is distinguishable from the criminal prosecution on the DUI charge. The provisions for an administrative suspension are liberally construed to advance the statute's purpose of promoting the public interest, and decisions restricting the application of implied consent laws are narrowly construed. *See State v. Price*, 333 S.C. 267, 273 n.7, 510 S.E.2d 215, 218 n.7 (1998) (stating the fact that the State affords procedural due process to a motorist prior to suspending

a driver's license does not transform the suspension from a remedial sanction into a punitive one); *see also Illinois v. Johnson*, 758 N.E.2d 805, 811 (Ill. 2001) (stating "the implied-consent statute is remedial in nature and, therefore, 'should be liberally construed' to preserve its overall purpose" (citation omitted)); *Minnesota v. Juncewski*, 308 N.W.2d 316, 319 (Minn. 1981) (observing decisions restricting the application of the implied consent law are to be narrowly construed (citation omitted)); *Wisconsin v. Reitter*, 595 N.W.2d 646, 652 (Wis. 1999) ("Given the legislature's intentions in passing the statute, courts construe the implied consent law liberally.").

### B.  Scope of Administrative Suspension Hearing

In furtherance of the goals described above, the General Assembly has statutorily prescribed the permissible scope of an administrative hearing challenging the suspension of a driver's license.  The statute contemplates an expeditious civil review but also "guards against an automatic or rote elimination of this [important] interest." *S.C. Dep't of Motor Vehicles v. McCarson*, 391 S.C. 136, 148, 705 S.E.2d 425, 431 (2011).  As with the penalties imposed, the General Assembly has differentiated the scope of the review based on whether the motorist submitted to— or refused to submit to—testing.

Section 56-5-2951(F) sets forth the permissible scope of the suspension hearing in cases where a motorist has *refused* to submit to testing as follows:

> (F)  A contested case hearing must be held after the request for the hearing is received by the [OMVH].  *The scope of the hearing is limited to whether the person*:
>
> (1) was lawfully arrested or detained;
>
> (2) was given a written copy of and verbally informed of the rights enumerated in Section 56-5-2950; [and]
>
> (3) refused to submit to a test pursuant to Section 56-5-2950 . . . .

S.C. Code Ann. § 56-5-2951(F)(1)-(3) (2018) (emphasis added).

There has been no dispute as to the first two factors to support the suspension: Sanders was properly arrested and he was informed of his implied consent rights. Therefore, the suspension hearing turned on the third factor, refusal to submit to a

test pursuant to the implied consent statute. *See id.* § 56-5-2951(F)(3); *see also City of Columbia v. Moore*, 318 S.C. 292, 296, 457 S.E.2d 346, 348 (Ct. App. 1995) (observing the law implies a person's consent to testing, "[b]ut this consent is only to chemical tests under the procedure plainly set forth in the statute").

The officer was authorized to ask for a blood test if any of the exceptions in section 56-5-2950(A) applied. *See* S.C. Code Ann. § 56-5-2950(A) (stating an officer need not offer a breath test "[i]f the person is physically unable to provide an acceptable breath sample because the person has an injured mouth, is unconscious or dead, *or for any other reason considered acceptable by the licensed medical personnel*" (emphasis added)). The court of appeals determined the record here supported the conclusion that the officer's request for a blood test was authorized because licensed medical personnel determined Sanders was unable to submit to a breath test.

## C. Licensed Medical Personnel

We first consider Sanders's argument that the court of appeals erred in finding there was substantial evidence in the record showing Nurse Albright was licensed medical personnel because the finding was based on hearsay.

This Court has recognized that the South Carolina Rules of Evidence (SCRE) are applicable to driver's license suspension hearings. *McCarson*, 391 S.C. at 147, 705 S.E.2d at 430 (citing S.C. Code Ann. § 1-23-330(1) (2005); Rule 1101(d)(3), SCRE). *McCarson* involved a dispute over the first statutory factor (whether the arrest was lawful), and the Court held that the DMV must present admissible evidence of probable cause. *Id.* at 149, 705 S.E.2d at 431. The Court noted hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," and stated hearsay is not admissible absent an exception. *Id.* at 146, 705 S.E.2d at 430 (quoting Rule 801(c), SCRE).

Under the implied consent statute, "licensed medical personnel" includes "physicians licensed by the State Board of Medical Examiners, *registered nurses [RNs] licensed by the State Board of Nursing*, and other medical personnel trained to obtain [blood and urine] samples in a licensed medical facility." S.C. Code Ann. § 56-5-2950(A) (emphasis added) (providing only licensed medical personnel as defined in the statute may take blood and urine samples and that the samples "must be obtained and handled in accordance with procedures approved by SLED").

Although Sanders argued at the hearing that he should have been able to cross-examine Nurse Albright as to whether she qualified as licensed medical personnel, personal attendance by the hospital employee has never been required to establish this fact. *See State v. Frey*, 362 S.C. 511, 514, 608 S.E.2d 874, 876 (Ct. App. 2005) (stating, in a DUI trial, that the "suggestion that [the hospital employee's] qualifications could be established *only* by his presence and testimony at trial is specious"). This fact, like any other, may be shown by several means.

The officer testified as to his first-hand observations of Nurse Albright, noting that she wore a hospital identification badge providing her name and title as an "RN," and he saw her performing the duties commensurate with the position of an RN in the emergency room. These personal observations by the officer during his investigation are not hearsay and constitute admissible evidence of Nurse Albright's status. *See State v. Evans*, 316 S.C. 303, 311, 450 S.E.2d 47, 52 (1994) (stating an investigator's testimony was "based on *personal* observations" and "was not merely relating what he was told by others," so it did not constitute hearsay); *see also State v. Salisbury*, 343 S.C. 520, 525, 541 S.E.2d 247, 249 (2001) (stating "[t]he officers' personal observations and opinions of Salisbury's actions, appearance, and condition constitute direct evidence because it is based on the officers' actual knowledge of the situation").

The officer's recollection of Nurse Albright's nametag is significant because, under South Carolina law, "[a] licensed nurse must clearly identify himself or herself as officially licensed by the board [State Board of Nursing]." S.C. Code Ann. § 40-33-39 (2011). To that end, a licensed nurse is required to "wear a clearly legible identification badge or other adornment at least one inch by three inches in size bearing the nurse's first or last name, or both, *and title as officially licensed*." *Id.* (emphasis added). Consequently, Nurse Albright was required under South Carolina law to wear a badge clearly identifying her licensure status during her employment with the hospital.

While Sanders belatedly opines to this Court that Nurse Albright could have engaged in a false "holding out" regarding her status (citing a news article about a "fake doctor"), Sanders made no contemporaneous attempt at the suspension hearing to allege that Nurse Albright engaged in any misleading conduct in this regard, nor did he dispute the officer's substantive testimony regarding Nurse Albright's status as an RN. Sanders could have rebutted the DMV's prima facie case, without the need to cross-examine Nurse Albright, by investigating Nurse Albright's licensing

status (or alleged lack thereof) himself.[3] *See generally id.* § 40-33-30(B) (providing it is unlawful for a person to use the designation "APRN," "RN," or "LPN" or any variation thereof, "or [to] use any title, sign, card, or device to indicate that the person is a nurse . . . unless the person is actively licensed" by the State Board of Nursing). Instead, Sanders relied solely on a hearsay objection, which we have found to be without merit. Accordingly, the court of appeals did not err in finding there is substantial evidence in the record showing Nurse Albright is licensed medical personnel.

### D. Officer's Request for a Blood Sample

Sanders next contends the court of appeals erred in holding there was substantial evidence in the record to support the officer's request for a blood sample, as the evidence of his alleged inability to submit to a breath test was inadmissible hearsay.

At the suspension hearing, the officer testified that he requested a blood test after arriving at the emergency room and being advised by licensed medical personnel (Nurse Albright) that Sanders was not able to take a breath test. Sanders's counsel made a general hearsay objection, arguing Nurse Albright should be present so he could question her as to her qualifications and the reason *why* she found Sanders was unable to take a breath test:

> [A]nybody can have hospital garb on . . . [the] defense needs to be able to cross-examine that particular person on his or her credentials. Secondly, this [SLED Report] doesn't say he wasn't able to leave the hospital. It says for some reason deemed acceptable by the licensed medical personnel. We have a right to ask that licensed medical personnel what that reason was. And we can't ask that

---

[3] The DMV notes that whether an individual holds a medical license is publicly verifiable information that is readily available on the website of the South Carolina Department of Labor, Licensing, and Regulation, and it states this Court could take judicial notice of Nurse Albright's licensing status under Rule 201, SCRE. Our review of the government website indicates Nurse Albright has been licensed as an RN since 1999 and her current South Carolina license is valid through April 2022. *See* S.C. Dep't of Labor, Licensing, & Regulation, https://llr.sc.gov/. This information is obviously compelling, but we need not rely on it in reaching our decision as there is substantial evidence in the record as to Nurse Albright's status.

person that reason without that person being here and we're not sure, again, she may well be a registered nurse, but we don't know that for sure and we don't have a right to cross-examine her credentials . . . .

As explained in the preceding section, hospital employees do not have to attend a proceeding for their qualification as licensed medical personnel to be established. *Frey*, 362 S.C. at 514, 608 S.E.2d at 876. Further, we categorically reject the assertion that Nurse Albright's presence was required at this summary proceeding so Sanders could challenge *the underlying reason why* licensed medical personnel found he could not take a breath test. The reason for the licensed medical personnel's determination is clearly outside the statutorily limited scope of the hearing procedure set forth by the General Assembly. *See* S.C. Code Ann. § 56-5-2951(F)(1)-(3) (stating the scope of the suspension hearing is limited to whether the person (1) was lawfully arrested or detained, (2) was given a written copy of and verbally informed of the rights enumerated in section 56-5-2950, and (3) refused to submit to a test pursuant to section 56-5-2950).

Here, the officer relied on the exception that licensed medical personnel found the motorist could not submit to a breath test. S.C. Code Ann. § 56-5-2950(A). The General Assembly has not required officers to question the judgment of licensed medical personnel or obtain a second opinion as part of the implied consent procedure. Nor has it authorized courts to engage in a post hoc analysis of the validity of the determination that the motorist could not take a breath test. The reason needs only to be one that is "considered acceptable *by the licensed medical personnel*," per S.C. Code Ann. section 56-5-2950(A) (emphasis added). *See Reitter*, 595 N.W.2d at 652 ("The law requires no more than what the implied consent statute sets forth.").

The soundness of this procedure is readily apparent. Sanders asserts that, if given the opportunity, he would have cross-examined Nurse Albright as to whether his medical treatment could have been expedited to secure his discharge sooner (theoretically to permit breath testing).[4] Asking Nurse Albright to opine on this question is of dubious value, particularly where Sanders never specifically testified that he would have submitted to a breath test if one had been requested. Sanders's

---

[4] As a practical matter, when a motorist is transported to the hospital due to injuries severe enough to warrant emergency treatment, it will be highly unlikely that the person will be discharged in time to meet the statutory window for taking a breath test (within two hours of arrest).

testimony centered on the nature of his injuries, and he maintained he did not recall being asked to take a blood test, nor anything else about his time in the hospital. *Cf. Taylor v. S.C. Dep't of Motor Vehicles*, 368 S.C. 33, 627 S.E.2d 751 (Ct. App. 2006) (holding the driver showed no prejudice from the fact that he did not receive a copy of the implied consent form from the officer, where the driver did not argue that he did not receive his implied consent rights at all or that he would have provided a blood test if he had received the implied consent rights in writing), *aff'd*, 382 S.C. 567, 677 S.E.2d 588 (2009).

The essential question here is—Did the officer comply with the implied consent statute in requesting a blood sample from Sanders? The limited scope of the administrative hearing is to test the conduct of *the officer* (not medical personnel) by requiring *the officer* to have probable cause for the arrest, to advise the motorist of his implied consent rights, and to request tests in compliance with the procedure outlined in the implied consent statute (which the motorist refused). S.C. Code Ann. § 56-5-2951(F)(1)-(3). Whether the licensed medical personnel was infallible in her determination is not within the limited scope of this administrative proceeding.[5] The critical fact is that the determination, whether correct or not, was communicated to the officer and, thus, justified the next step in his investigation— the request for a blood sample.[6] We agree with the court of appeals that the evidence offered to explain or support the officer's investigation does not constitute hearsay.[7]

---

[5] Considering the remedial purpose of the implied consent statute and the statutory scope of the suspension hearing, we find the General Assembly did not intend the suspension hearing to be a forum for competing medical experts.

[6] *Cf. Andros v. Oregon ex rel. Dep't of Motor Vehicles*, 485 P.2d 635 (Or. Ct. App. 1971) (holding whether there were reasonable grounds for the officer's request to take a chemical test did not depend on whether the driver *was in fact under the influence* of intoxicating liquor; rather it was dependent on whether the arresting officer *had reasonable grounds to believe* that to be so).

[7] *See, e.g.*, *State v. Brown,* 317 S.C. 55, 63, 451 S.E.2d 888, 894 (1994) (holding "an out of court statement is not hearsay if it is offered for the limited purpose of explaining why a government investigation was undertaken"); *State v. Sims*, 304 S.C. 409, 420, 405 S.E.2d 377, 383 (1991) (holding the officer's testimony from an out of court declarant was offered to explain the officer's actions regarding the defendant and was not inadmissible hearsay), *cert. denied*, 502 U.S. 1103 (1992);

Officers are required to administer the implied consent statute in accordance with procedures developed by SLED and to issue reports any time tests are requested. *See generally* S.C. Code Ann. § 56-5-2950(I) ("A person required to submit to tests by the arresting law enforcement officer must be provided with a written report including the time of arrest, the time of the tests, and the results of the tests before any trial or other proceeding in which the results of the tests are used as evidence."); *see also id.* § 56-5-2950(A) (stating "[t]he breath test must be administered by a person trained and certified by the South Carolina Criminal Justice Academy, pursuant to SLED policies. . . . Blood and urine samples must be obtained and handled in accordance with procedures approved by SLED.").

Nurse Albright signed the SLED Report, as did Sanders, so he was contemporaneously informed of Nurse Albright's determination (that he could not submit a breath sample) and he was given a copy of the SLED Report, all in compliance with the officer's reporting duties. While we conclude the information communicated to the officer was not hearsay for purposes of this implied consent hearing, we note that, if Sanders believed the officer's testimony that Nurse Albright had made a determination of any kind was also false, he always had the recourse of rebutting it by calling her as a witness himself.

Lastly, we observe that, at the hearing, Sanders's counsel urged the OMVH to overturn the suspension on the alternative ground that Sanders "had a significant head injury, had a concussion," and did not "remember anything until he woke in jail the next morning" with "blood all over the back of his head." Sanders testified that he could not remember anything from the time of the accident until he woke up in jail, and he described himself as "very disoriented," "fuzzy," "foggy," and having "no clue" as to his surroundings after his accident. It is unclear how counsel intended this assertion to provide a legal basis for overturning the suspension, and Sanders does not rely on it here. We note, however, that the implied consent statute provides that if a motorist has an injury to the mouth, is *unconscious*, or dead, a breath test need not be requested, and this determination need not be made by licensed medical

---

*State v. Thompson,* 352 S.C. 552, 559, 575 S.E.2d 77, 81 (Ct. App. 2003) (finding testimony about a bystander's statement to the police was not hearsay because it was not offered to prove the truth of the matter asserted but rather to explain the officer's reason for going to the defendant's home); *State v. Kirby,* 325 S.C. 390, 396, 481 S.E.2d 150, 153 (Ct. App. 1996) (concluding testimony by a police officer about a dispatcher's call reporting drugs and firearms in a car was not hearsay where offered to explain the reason for the initiation of police surveillance of the vehicle in question).

personnel.  *See* S.C. Code Ann. § 56-5-2950(A) (exceptions); *State v. Kimbrell*, 326 S.C. 344, 348, 481 S.E.2d 456, 458 (Ct. App. 1997) (observing while these grounds need not be based on the judgment of licensed medical personnel, the evidence must reveal a reasonable basis to support them).  Even if Sanders were rendered unconscious, however, the result would not have been the excusal of all testing; rather, under the statute, it would have justified the officer's request for a blood test.

## IV.  CONCLUSION

We conclude the substantial evidence in the record supports the DMV's suspension of Sanders's driver's license.

**AFFIRMED.**

**KITTREDGE, HEARN, FEW and JAMES, JJ., concur.  FEW, J., concurring in a separate opinion.**

**JUSTICE FEW:** I concur with the majority. I write to share my thoughts on whether the nurse's statements are hearsay. As with many hearsay questions, it is actually not a hearsay question. It is a statutory interpretation question. Sanders argues subsection 56-5-2950(A) of the South Carolina Code (2018) requires the State to prove a suspect was "physically unable to provide an acceptable breath sample." The Department argues subsection 56-5-2950(A) requires only that the State prove the medical professional had an "acceptable" reason for determining the suspect was "physically unable" to provide a breath sample. If we resolve this dispute over statutory interpretation, we will answer the hearsay question. In other words, once we determine what subsection 56-5-2950(A) requires the State to prove at the hearing, the answer to the hearsay question follows without serious controversy.

Under Sanders' interpretation of the subsection, the question at the hearing is, "Was the suspect 'physically unable to provide an acceptable breath sample.'" If Sanders is correct, the State would need the nurse's statements to be true to prove Sanders' physical condition. Necessarily, the State would offer the statements in evidence for the purpose of proving the truth of the matter asserted in the statements. The statements—in that event—would be hearsay.

The Department, however, is correct. I do not believe subsection 56-5-2950(A) can be read to require the State to prove the suspect's physical condition. As the Chief Justice explained, proving such a subjective point of medicine is beyond the scope the General Assembly intended for these hearings. "Whether the licensed medical personnel was infallible in her determination is not within the limited scope of this administrative proceeding." Rather, the most sensible reading of subsection 56-5-2950(A) is it requires only that the State prove the licensed medical professional made the determination the suspect was "physically unable" for a reason the professional "considered acceptable." *See State v. Stacy*, 315 S.C. 105, 107, 431 S.E.2d 640, 641 (Ct. App. 1993) ("[W]e hold that the statute requires a licensed [professional] . . . to determine whether an acceptable reason exists for finding that a person is unable to provide an acceptable breath sample."). Thus, to prove what subsection 56-5-2950(A) requires, it is not necessary that the professional's statements be true. The State may offer the statements in evidence for the sole purpose of proving the statements were made, and the statements are not hearsay.